## WILLIAM M. TAYLOR *v.* CYRUS PALMER *et als.*

RESOLUTION TO DO STREET WORK IN SAN FRANCISCO.—A resolution of the Board of Supervisors of San Francisco declaratory of their intention to perform work on a street, adopted since the amendments to the Consolidation Act made in 1862, need not be presented to the Mayor for his approval.

PUBLICATION OF INTENTION TO DO STREET WORK.—Sundays are included in the

count of the "ten days" which a resolution of the Board of Supervisors of San Francisco, declaratory of an intention to perform work on a street, is required to be published.

CONSTRUCTION OF TWO SECTIONS OF SAME ACT.—Where two sections of a law relate to the same matter, both are to be read together, in order to ascertain the intent of the Legislature.

CONTRACT TO DO WORK ON STREET IN SAN FRANCISCO.—A contract to grade a street in San Francisco need not follow the precise language of the statute, or contain a condition in express terms that "the materials used shall be such as are required by the Superintendent of Streets." If by fair and reasonable construction it can be held to contain such condition, the call of the statute is answered.

SPECIFICATIONS ANNEXED TO CONTRACT.—If a contract to do work provides that the work shall be done according to certain specifications which are annexed to it, the specifications are a part of the contract.

EXTENSION OF TIME TO PERFORM CONTRACT TO DO WORK ON STREET.—Since the amendments to the Consolidation Act passed in 1863, the Board of Supervisors of San Francisco may extend the time within which a contract to perform work on a street is to be performed.

ASSIGNABILITY OF CONTRACT TO DO WORK ON STREET.—A contract to perform work on a street in San Francisco may be assigned, and the assignee, if he fulfils the conditions of the same, can enforce it; and if such contract has been assigned, and the assignee performs the contract, the warrant, when issued for the work, may be delivered to the original contractor, who may make demand for its payment.

"ASSESSMENT" AND "TAXATION."—The words "taxation" and "assessment," as used in the Constitution of this State, do not have the same signification.

POWER OF "TAXATION."—The power of "taxation" is a power which the Legislature takes, from the law of its creation, to impose taxes upon the property of the citizens for the support of the Government.

MEANING OF WORD "ASSESSMENT."—The word "assessment" is employed in the Constitution to represent those local burdens imposed by municipal corporations upon property bordering upon an improved street, for the purpose of paying the cost of the improvement, and laid with reference to the benefit the property is supposed to receive from the expenditure of the money. Property not benefited by the improvement, cannot be subjected to an assessment for it.

POWER OF "ASSESSMENT."—The power of "assessment" cannot be exercised as an independent or principal power like that of "taxation," but must be used as an incident to the power of organizing municipal corporations.

PERSONAL LIABILITY FOR STREET ASSESSMENT.—The owner of land in a municipal corporation, bordering upon an improved street, cannot be made liable for the cost of the improvement beyond the value of his land.

PERSONAL LIABILITY OF STREET ASSESSMENT UNCONSTITUTIONAL.—That part of the Consolidation Act of San Francisco which makes the owner of a lot bordering on an improved street personally liable for that part of his assessment for the improvement of the street which may remain unpaid after a lien has been enforced on the lot, is unconstitutional.

CORRECTING ASSESSMENT.—An assessment on a lot in San Francisco for a street improvement, if made to one alone of several joint owners, can be corrected only by an appeal to the Board of Supervisors.

FINDING OF FACTS.—When a judgment is rendered on the pleadings, the Court need not make any finding of facts.

APPEAL from the District Court, Twelfth Judicial District, City and County of San Francisco.

Plaintiff recovered judgment in the Court below, and defendant Palmer appealed.

The other facts are stated in the opinion of the Court.

*Ralph C. Harrison,* and *Samuel M. Wilson,* for Appellant, argued that the resolution of intention to perform the work should have been signed by the Mayor; and cited *Creighton* v. *Manson,* 28 Cal. 614; *Kennedy* v. *Newman,* 1 Sand. S. C. 187; Stat. of 1856, Sec. 68, p. 163; and that the resolution should have been published ten secular days; and cited *Sanford* v. *Worn,* 27 Cal. 174; Laws 1865, p. 525; Laws 1862, p. 403, Sec. 25. They also argued that no right of action existed in favor of the plaintiff upon the contract, because he was not the one who contracted to do the work, and the contract was of a personal nature and not capable of assignment; and cited *Stevens* v. *Bennett,* 31 E. L. & E. 283; *Robson* v. *Drummond,* 2 B. & Ad. 303; and that after the contractor had parted with his interest in the contract, it was illegal to issue the warrant to him. They further argued that the assessment was void, because it was made to Palmer alone, when there were several joint owners of the property; and cited *Bidleman* v. *Brooks,* 28 Cal. 72; *Smith* v. *Davis,* 30 Cal. 536; *Kelsey* v. *Abbott,* 13 Cal. 619; *People* v. *Sneath,* 28 Cal. 612; and Stat. of 1862, p. 397, Sec. 9.

*S. O. Houghton,* for Respondent, argued that the Act of 1862 (Laws 1862, p. 391) did not require a resolution of intention tó do work on a street to be presented to the Mayor for his signature, and that the Act did not require a publication for ten secular days, and that the contract was not of a personal nature, and therefore could not be assigned, and that Taylor was entitled to the warrant and could have demanded the money, but that it was a matter entirely between Smith

& Co. and Taylor, who should receive the warrant, with which defendants had no concern.

By the Court, SANDERSON, J.:

Action to recover a street assessment and to enforce a lien for the same against certain real estate in the City of San Francisco. The plaintiff asked and obtained judgment upon the pleadings. Palmer is the only defendant who appeals.

It is not claimed that any material issues of fact are made by the pleadings. The points made are all directed against the complaint which is claimed to be insufficient in several respects.

I. It is first objected that it is not alleged that the resolution of intention to order the work in question to be done, adopted by the Board of Supervisors, was ever presented to the Mayor for his signature or approval, or that it was ever signed or approved by him.

In support of this point *Creighton* v. *Manson*, 27 Cal. 613, is cited. That case is not in point. It declares the law as it existed prior to the amendments of 1862. Sections forty and sixty-eight of the Consolidation Act of 1856 were before us in that case, and it was held that under them a resolution of intention to do street work must be presented to the Mayor for his approval before it can take effect; but that rule has been abrogated by the amendments of 1862, which expressly provide that ordinances or resolutions touching street work therein provided for shall not be deemed to be such ordinances or resolutions as are mentioned in the sixty-eighth section of the Act of 1856. (Statutes, p. 391, Sec. 3.) The contract in this case was made and all of the proceedings of the Supervisors preliminary thereto were had subsequent to the Act of 1862, and the rule now applicable to the question in hand is found in the fourth section of that Act, which provides that the Supervisors may order street work to be done " after notice of their intention so to do, in the form of a resolution, describing the work and signed by their Clerk, has been pub-

lished for a period of ten days." This provision, in connection with the one already mentioned, makes it clear that the ordinances or resolutions authorized by the Act of 1862 need not be presented to the Mayor for his approval, and that resolutions of intention need only be passed by the Board of Supervisors and signed by their Clerk in order to become valid, all of which is alleged in the complaint in this case. We so held in *Cochran* v. *Collins*, 29 Cal. 131; but we did not deem it necessary in that case to discuss the question at length, because we considered the change in the rule to be obvious.

II. It is next claimed that it appears from the complaint that the resolution of intention was not published for the period of ten days before the street work in question was ordered to be done, and that therefore the Supervisors had not acquired jurisdiction at the time the latter resolution was passed.

It appears that the resolution of intention was first published on the 28th of July, 1864, and that the resolution ordering the work to be done was passed on the 8th of August. Between these dates two Sundays intervened. If they are included in the count the Supervisors had acquired jurisdiction, otherwise not.

We are of the opinion that the intervening Sundays are to be counted. The fourth section requires the resolution of intention " to be published for a period of ten days." No exception is made in favor of Sundays. They are, therefore, to be counted, so far as the provisions of that section are concerned. The sixth subdivision of the twenty-fifth section provides : " That all notices shall be published daily (Sundays excepted) in the newspaper which has the contract for the city and county printing." These two provisions contain all that is said upon the subject. Both relate to the same matter, and are therefore to be read together in order to ascertain the intent of the Legislature. The first is limited and applies to notices of intention only. The latter is general and applies to all notices required by the provisions of the Act. Strip the latter of its general application and limit it also to the notice

in hand, and we have the following reading: " The notice of intention shall be published for a period of ten days, and shall be published daily, Sundays excepted;" or, to express what we consider to have been the intent more fully: " The notice of intention shall be published for a period of ten days, during which period it shall be published daily, except on Sundays, on which days it need not be published."    The exception in favor of Sundays relates to the " daily publishing " of the notice, and not to the period of time during which the publication is to be continued.    If such be the true meaning of the statute, and we think it is, it follows that the Board of Supervisors had acquired jurisdiction at the time the resolution directing the work to be done was passed.    The case of *Price* v. *Whitman*, 8 Cal. 412, is not in point.    There is an obvious difference between the language of the Constitution which was construed in that case and the language of the statute in hand.

III. It is next claimed that the contract in suit, which is annexed to the complaint and made a part of it, is invalid because it does not contain the condition—made essential by the statute—that " the materials used shall be such as are required by the Superintendent of Streets."

The objection is without substantial foundation.    The contract may not follow the precise language of the statute.    It is not necessary that it should.    If it can be held to contain the condition in question by a fair and reasonable construction the call of the statute is fully answered.    This it undoubtedly does.    " The party of the first part promises    *    *    *    to do and perform, or cause to be done and performed, in a good and workmanlike manner, under the direction and to the satisfaction of the Superintendent, and furnish all the necessary materials required for the execution and completion," etc. " Required " by whom?    The Superintendent, of course. Moreover, it is agreed that the work shall be performed according to certain specifications which are annexed and which must have been prepared by or under the direction and supervision of the Superintendent, in which the nature of the work

and character of the materials are specified. Taking the body of the contract and specifications, which are equally a part of it, together, and we think that there has been no substantial departure from the conditions of the statute in the respect suggested. We have before decided this precise point. (*Emery* v. *San Francisco Gas Company*, 28 Cal. 377.)

IV. The contract requires the work to be performed within thirty days. The work was not completed at the expiration of that time, and two days thereafter the time was extended by a resolution of the Board of Supervisors; and it is next urged that this extension was illegal and vitiated the whole proceedings, because, as is claimed, the Board at the expiration of the thirty days lost all jurisdiction.

It may be that this point would have been good under the Act as passed in 1862, for while by the seventh section the Superintendent is authorized to fix the time for the commencement of the work, and under the direction of the Board of Supervisors to extend the time so fixed, he is not expressly authorized, either there or elsewhere, so far as we have been able to discover, to extend the time fixed for the completion of the work. But be that as it may, this latter power is expressly conferred in that section as amended in 1863, (Statutes, p. 526,) in the following words : "And said Superintendent shall fix the time for the commencement and completion of the work, under all contracts entered into by him, and may extend the time so fixed from time to time under the direction of the Board of Supervisors." Nor is it made necessary in terms that this power of extension should be exercised before the expiration of the time previously fixed. On the contrary, it is provided in the succeeding sentence, in general terms, that "in all cases where the Superintendent, under the direction of said Board, has extended the time for the performance of contracts, the same shall be held to have been legally extended." In view of these express provisions of the statute, and the general language employed, there can be no doubt but that the extension given in this case was within the power of the Board of Supervisors.

V. The contract in suit was made by the Superintendent with Smith & Co., who assigned to the plaintiff, by whom the work was performed, and it is next claimed that the contract belongs to that class which the party who is to perform the stipulated work is not permitted to assign, by reason of the trust and confidence reposed in his skill and ability by the other contracting party.

Passing the question whether the defendant is in a position to make this point, (a point not made by the plaintiff,) it is clear to us that this contract does not belong to the class suggested. There is nothing in the statute or the contract or the nature of the work suggestive of such a theory. On the contrary, the public generally are invited to bid for and take these contracts regardless of professions, trades or occupations. Aside from the discretion vested in the Board of Supervisors to reject all bids when they deem it for the public good, or the bid of any party who may have proved delinquent or unfaithful in any previous contract with the city, there is no restriction upon the capacity of the contractor. He is not expected nor required to perform the work in person. Were it so, street improvements in San Francisco would make slow progress. Whether he knows anything about road making, or can tell the difference between a mud turnpike and a Nicholson pavement, or whether a sewer should be constructed in the shape of a longitudinal section of an egg shell, or which end of the section should be uppermost, is of no consequence, for the contract is not awarded to him because of his supposed knowledge or skill, but because his bid is the lowest and his bond for the performance of the work in a workmanlike manner and according to the specifications is good. All painters do not paint portraits like Sir Joshua Reynolds, nor landscapes like Claude Lorraine, nor do all writers write dramas like Shakspeare or fiction like Dickens. Rare genius and extraordinary skill are not transferable, and contracts for their employment are therefore personal, and cannot be assigned. But rare genius and extraordinary skill are not indispensable to the workmanlike digging down of a sand hill or the filling

up of a depression to a given level, or the construction of brick sewers with manholes and covers, and contracts for such work are not personal, and may be assigned. (*Cochran* v. *Collins*, *supra.*)

But independent of the foregoing considerations, the form of the warrant given by the Superintendent, as prescribed in the statute, recognizes the assignable quality of these contracts, and the statute nowhere gives color to the suggestion of counsel that the recognition is confined to assignments made after the work has been performed. Finally, by the terms of the statute and the contract, the work is to be performed under the direction and to the satisfaction of the Superintendent of Public Streets and Highways. It is his genius and skill, therefore, which gives form and excellence of performance to the work, and it is, therefore, in his genius and skill, if anywhere, that trust and confidence are reposed. (*Emery* v. *Bradford*, 29 Cal. 75.)

VI. It is next claimed that no warrant, such as is authorized by the statute, was ever issued, and no demand, such as the statute requires, was ever made for the sum due upon the assessment. These points are respectively founded upon the fact that the warrant was issued running to the original contractors, (Smith & Co.,) their agents or assigns, and was delivered to them, and the fact that the demand for its payment was made by them.

There was nothing irregular or vicious in all this. On the contrary, the warrant was in the precise form of the statute, which is the proper form whether the contract has been assigned or not; and it is lawful and regular for the Superintendent to deliver it to the parties named in the contract. The form of the warrant is the same in all cases, and in the absence of any notice of an assignment of the contract, and perhaps in any event, the Superintendent delivers it, as a matter of course, to the original contractor if applied for by him, if not to any other person authorized by him to receive it either as agent or assignee. Likewise the demand for payment may be made by the original contractor, his authorized

agent or assignee.   Where an assignment has been made, and
the demand is by the original contractor, he acts as the agent
of his assignee.   The property holder may safely pay to any
one who, on the face of the warrant, is entitled to receive the
money, especially in the absence of any notice to the contrary,
and there is no pretense that there was such a notice in this
case.   It may be added, finally, that the property holder has
no concern or interest in all this, except to have an opportu-
nity to pay his money to a party whose receipt therefor is a
good discharge.   He need not trouble himself to ascertain
whether the contract has been assigned, or to run after the
assignee with a view of thrusting the money into his pocket.
He may safely rest in ignorance of such a character, and pay
his money to the holder of the warrant.  If there is an assignee,
and he chooses to allow his assignor to receive the warrant
and collect the money, thereby making him his agent for that
purpose, and to take no steps to prevent it or to assert his
claim in person, it is difficult to perceive why the property
holder who can under such circumstances safely make pay-
ment to the original contractor, should become so solicitous
about the interests of any supposed assignee of his.   However
commendable such solicitude may be on the score of morals,
it is sufficient to say that the law does not exact it.

VII.  The judgment in this case follows the form prescribed
by the Practice Act in actions for the foreclosure of mortgages.
It determines the amount to be recovered, declares a lien
upon the lot in question and directs it to be sold and the pro-
ceeds of the sale to be applied to the payment of the amount
recovered, and the surplus, if any, to be paid to the defend-
ants.   If there is a deficiency, the Sheriff is directed to report
the amount, and the Clerk is directed to docket the same as a
personal judgment against the defendants, drawing interest at
the rate of ten per cent per annum, to be collected by execu-
tion.

This form of judgment is expressly authorized by the statute
(Secs. 13 and 17), but we are of opinion that the statute is

unconstitutional so far as it affords relief beyond the fund to be realized by a sale of the property assessed. In *Emery* v. *Bradford*, 29 Cal. 88, we held that a personal judgment was authorized by the statute, but whether the statute was in that respect constitutional was not considered. It would seem that this latter point was not made. But be that as it may, it is clear that it was not decided. Neither was the point considered in *Emery* v. *San Francisco Gas Co.*, 28 Cal. 345. That case was confined, so far as the validity of the statute is concerned, to the consideration of the power of the Legislature to confer upon municipal corporations the power to assess upon adjoining lots the cost of street improvements, and whether it was a part of the power of eminent domain or of the power of taxation; and we held that the power existed and that it was a part of the power of taxation and not of eminent domain. We held, further, that the word "assessment," as employed in the Constitution, while it represented in part the general power of taxation vested in the Government, was used to designate a particular branch of that power specifically different in its purpose and mode of working from that intended by the more general and comprehensive term of "taxation." That by the latter the power of imposing taxes upon the property of the citizen generally for the support of Government was intended, and by the former the power of imposing a tax for the purpose of improving the streets of cities and incorporated villages upon the property bordering upon or in the vicinity of the improvement. That the power of taxation, as contradistinguished from assessment, was intended to be exercised upon the *ad valorem* principle and in such a manner as to secure equality and uniformity; but that the power of assessment, as contradistinguished from that of taxation, need not be exercised upon the *ad valorem* principle, but on the contrary, that the Legislature was at liberty to adopt a different mode or basis of apportionment—such as frontage, benefit received, or superficial contents. At this point the discussion in *Emery* v. *San Francisco Gas Co.* stopped. We did not directly consider whether the power of

assessment was limited in its effect upon the property of the taxpayer to that which borders upon and is benefited by the improvement or could be extended by any mode of procedure so as to reach other property not so situated, and subject it also to the burden imposed. That precise question was left open and remains to be determined now, but it will be found, after all, that the principles discussed and settled in that case are adequate to its solution when extended and applied; for the definitions of " taxation " and " assessment " as there given need only be interrogated in order to get a complete answer to the question in hand.

While the power of assessment comes from the general power of taxation it must not be confounded with it, for as we have seen in *Emery* v. *San Francisco Gas Co.*, the words " taxation " and " assessment " are employed in the Constitution to represent different modes of exercising the general power of taxation, and also as indicating different objects and purposes in aid of which a resort to the taxing power may be had. In their origin and legal or constitutional complexion they are the same; but in the mode of their exercise, and in the effect of such exercise upon the property of the taxpayer they are essentially different. In the consideration of the present question, therefore, which brings into view only their application and effect upon the property of the taxpayer and not their source and nature, it is proper, in order to avoid confusion, to consider and treat them, for the purposes of the argument, as separate and distinct powers.

In exercising the power of taxation the Government is authorized to call upon the taxpayer for an unlimited percentage upon the value of all his property not exempt from taxation. It must be so exercised as to operate, so far as possible, equally and uniformly. The burden imposed must be apportioned upon the *ad valorem* principle, and not otherwise. From this mode no departure can be made, for such is the iron rule of the Constitution. This power is vested in the Legislature, to be exercised by that body directly for the purposes of State revenue, and to be delegated to counties, cities

and incorporated towns or villages for the purposes of local revenue for the support of the local government. In its exercise counties, cities and incorporated villages are governed by the same rules by which the Legislature is governed. It must be exercised by them so as to operate, so far as may be, equally and uniformly upon all the taxable property within their geographical limits, and the burden imposed under it must be apportioned upon the property taxed according to its value.

The power of assessment, on the other hand, is of municipal rather than State, consequence. It is not mentioned in the Constitution as a direct legislative power, but as a power appertaining to cities and incorporated villages. (Con., Art. IV, Sec. 37.). It is merely recognized as a power inherent, or, at least, necessary to the complete working of a municipal government. It is mentioned as a power of municipal government familiarly known to and well understood both by the framers of the Constitution and the people at large. It is true that the power of assessment is vested in the Legislature, but it is so in a modified sense. It is not so vested as an independent or principal power, like that of taxation, but as a part of, or as an incident to the power of organizing municipal corporations and providing for them a system of government to the proper working of which the power of assessment is indispensable. It was not intended that the power of assessment should be exercised by the Legislature, and it never can be, except through the intervention of a municipal corporation; for whenever the Legislature undertakes to exercise the taxing power directly, it works under the power of taxation as distinguished from that of assessment.

The power of taxation is a power which the Legislature takes from the law of its creation, for it is an indispensable power, without which it would become impossible for that body to perform its functions; or, in other words, the power does not come from the Constitution. That instrument, so far as it deals with the subject, as is well understood, is not a grant, but a limitation. Take away the constitutional limita-

tions, which are that the burden must be apportioned upon the *ad valorem* principle, and made to operate equally and uniformly, and the Legislature would be enabled to enforce the power of taxation by the mode designated by the word "assessment;" but with the *ad valorem* limitation it cannot, for thereby a different mode is prescribed, and the Legislature limited to that mode. Hence, until the Legislature undertakes the performance of the duty enjoined upon it by the thirty-seventh section of the Fourth Article of the Constitution, which is "to provide for the organization of cities and incorporated villages, and to restrict their power of taxation, assessments, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such corporations," it has and can have nothing to do with the mode of enforcing the taxing power represented by the word "assessment." It is only while working under this provision of the Constitution that the Legislature can deal at all with the subject of "assessments."

The Constitution does not provide what powers the Legislature shall confer on municipal corporations, but assumes that certain powers, among which are "taxation" and "assessment," are indispensable to corporate existence, and that without them a municipal corporation would be unable to sustain itself or perform its functions. It does not undertake to define those powers, but assumes that everybody knows what they are, and that the Legislature must necessarily grant them by the very act of creating the corporation. It results that the Legislature not only may grant, but must grant to one of its creatures a power which it is not permitted to exercise in its own capacity, or to observe greater exactness, the privilege of exercising the power of taxation for certain purposes in a mode in which the Legislature is forbidden to exercise it. The power exists in the Legislature under the general name of "taxation," and while it remains there its exercise is restricted to a particular mode; but when it is transferred to the corporation it throws off the name of taxation and the restrictions resting upon it while in the hands of the Legisla-

ture and assumes that of " assessment," and, as we shall presently see, accomplishes its ends by a different mode.

What, then, is this power of assessment, and, if any, what are its limitations? We have already answered this question in a general way. The question is one of definition only. Not of the word in its most enlarged sense, but of the word as used in the Constitution and as indicating an element of municipal power. At the time the Constitution was framed this word had, in the connection in which it is used, obtained a popular and legal signification which was well understood. Moreover, the provision of the Constitution in which it is found was borrowed from the Constitution of New York, where, as well as in other States, the word had already received a judicial interpretation. The Constitutional Convention must therefore be understood to have used the word in the sense in which it had been used in the Constitution from which it was taken, which also was its popular sense. It was employed therefore to represent those local burdens imposed by municipal corporations upon property bordering upon an improved street or situated so near to it as to be benefited by the improvement, for the purpose of paying the cost of the improvement, and laid with reference to the benefit which such property is supposed to receive from the expenditure of the money. This definition *ex vi termini* describes the power and defines with precision its limits. It is not a power to tax all the property within the corporation for general purposes, but a power to tax specific property for a specific purpose. It is not a power to tax property generally founded upon the benefits supposed to be derived from the organization of a government for the protection of life, liberty, and property, but a power to tax specific property founded upon the benefit supposed to be derived by the property itself from the expenditure of the tax in its immediate vicinity. Hence property not benefited by the improvement cannot be subjected to the burden imposed for that purpose.

To say that the owner of land bordering upon an improved street can be made personally liable for the payment of the

improvement is equivalent to saying that his entire estate, real, personal and mixed, whether bordering upon the street or remote from it, whether within the corporate limits or without, whether benefited or not, shall be held responsible for the tax, which, in turn, is equivalent to saying that his entire estate may be taxed for the improvement in direct contradiction of the very terms of the power. To uphold such a doctrine would be to overthrow the distinction which, in *Emery* v. *San Francisco Gas Co.* and the several cases there cited, is shown to exist between the power of taxation and the power of assessment, as contradistinguished from each other. Under it the power of " assessment " becomes the power of " taxation " in contradistinction, and of course subjected to all the restrictions placed by the Constitution upon the exercise of the latter, which is equivalent to saying that the power of " assessment " as contradistinguished from that of " taxation," has no existence under the Constitution.

To avoid any misconception of our meaning, we add that the power of taxation, when exercised either by the Legislature immediately or mediately through the intervention of a municipal corporation, must be exercised under and within the limitations of the Constitution—that is to say, it must be exercised upon the *ad valorem* principle, and so as to secure equality and uniformity, except when exercised through a municipal corporation for the purpose of improving its streets. When so exercised, it is withdrawn or excepted from the constitutional limitations so far, and no farther, as to permit its exercise for the purpose and in the mode indicated and measured by the word " assessment," as defined and understood in the legislative and judicial history of the country at the time the Constitution was adopted. At that time a personal liability, to be satisfied by the seizure of other property than that assessed, property not bordering upon nor in the vicinity of the improved street, and therefore not benefited by the improvement, constituted, so far as we are advised, no part of the mode. The mode then in vogue was made by definition a part of the Constitution, and became and remains the meas-

ure of the power of "assessment" which may be restricted by the Legislature with a view to prevent abuse, but cannot be enlarged without overturning the limitations of the Constitution.

VIII. This action was brought against the appellant, Palmer and six other persons, all of whom are alleged to be owners of the lot in question within the meaning of the seventeenth section of the statute. But it appears that the tax for the improvements in question was assessed against Palmer alone. As to two of the defendants named in the complaint, the action was discontinued, and one disclaimed any interest in the lot. Palmer defended, and the remaining three were defaulted. The judgment finds that the tax is due from Palmer and those who made the default, and is joint and several against all of them.

In view of these facts it is claimed that the complaint is *felo de se*, because the assessment is thereby shown to be illegal and void; it being claimed that if the defendants are joint owners, the assessment should have been made against them jointly in order to secure to each his right to contribution from the others, and that if they are owners in different parcels in severalty they should have been separately assessed each for his portion.

If, for the reasons suggested, the assessment was not properly made, the appellant's remedy was by appeal to the Board of Supervisors, as provided in the twelfth section of the statute. He is named in the assessment, and was therefore put upon his appeal if he had any fault to find. If he owned in common with others, or if he owned only a part of the premises, he could have appealed to the Board of Supervisors and had the assessment corrected to suit the facts. Not having done so, he cannot now question the validity of the assessment upon the ground suggested. (*Emery* v. *Bradford*, *supra*.)

IX. Notwithstanding judgment was rendered upon the pleadings, the Court prepared and filed findings of fact. Exception is taken to this mode of procedure.

The finding has nothing to do with the case, and we have entirely disregarded it. A motion for judgment upon the pleadings confesses the facts to be as there stated, and is equivalent to a general demurrer to the answer.

The judgment must be modified by striking out so much thereof as relates to any deficiency which may be found to exist after the sale of the lot.

And it is so ordered.

Sawyer, J., dissenting :

I dissent from the conclusions attained by a majority of my associates upon the point upon which the judgment is modified, although I concur in much, but not all, that is said in discussing it. It does not appear to me that the reasoning in the prevailing opinion necessarily leads to the conclusion which I understand to be attained, that the amount which may be assessed upon the property adjacent to the improvement, and legally collected, may not be made a general personal charge against the owner, as well as a lien upon the property assessed. I am unable to perceive that the collection of the amount legally payable out of other property than that which is the basis of the assessment is a transfer of the assessment from the property assessed to the property out of which the amount actually collectable is paid. The property assessed is still the foundation upon which the assessment is based, and the rest relates to the remedy for collecting the amount which the land, or the owner, is liable to pay. Nor do I understand that this view would necessarily authorize the collection of an amount greater than the real value of the property assessed. The amount for which property actually sells under the Sheriff's hammer is not conclusive of its real value. Under the rules of evidence such amount is not the measure of the value. Time will not now permit a more extended discussion of the question, but, if the other business

of the Court will permit, I will express my views more fully hereafter.

In the other points determined, I concur.

SHAFTER, J., dissenting :

There are two questions : First, can the Legislature, under the Constitution, authorize the rendition of a personal judgment for the recovery of a street assessment ; and, second, if it has the power, then has it so exercised it in the Act of 1862 that the personal judgment for which the Act provides can be carried into execution.

As to the first question, it is admitted that if the power exists, it exists subject to the limitation that the lot holder cannot be made liable *in personam* for a sum exceeding the value of the lot upon which the assessment is made.

It is conceded in the prevailing opinion that a personal judgment, restricted to the value of the lot, may be authorized by the Legislature in the absence of express inhibition or inhibition by necessary implication. Such inhibition is found by my brethren in the word " assessment," as it is used in the thirty-seventh section of the Fourth Article of the Constitution. I admit that the word, considered *ex vi termini*, involves a negation upon the disputed power. But the question does not stand upon the force of the word, for while it is made the duty of the Legislature to provide for the organization of cities and incorporated villages, it is also made its duty, in the same section, " to restrict their power of taxation, assessment, borrowing money, contracting debts and loaning their credit, so as to prevent abuses in assessments and in contracting debts by such municipal corporations." It therefore will not do to say that the legislative power is to be tested by the general meaning of a word whose general meaning the Legislature not only has power to " restrict," but is bound to restrict by express constitutional direction. The word does not dominate the Legislature, but to the intent of reasonable restriction, the Legislature dominates the word. It is unnecessary to argue

concerning the exact limits of the legislative power to control
the meaning of the word "assessment." It is enough that it
cannot destroy the municipal power locked up in the word
by any arbitrary change of its meaning, nor by any merely
capricious innovation upon it. The legislative power to
restrict the municipal power to assess terminates at the point
where the legislative power to restrict the municipal power
to contract debts and to borrow money terminates, namely:
on the verge where "abuses" arise or threaten. In view of
the evils with reference to which the legislative right of inter-
ference in municipal affairs is recognized, but more particu-
larly in view of the fact that all intendments go to the
enlargement of the right and not to its restrictions, I conclude
that it is, at least, competent for the Legislature to dictate
concerning the remedies to be used in enforcing a payment of
assessments—it being always understood that the Legislature
cannot extend the personal liability which it may enact
beyond the value of the lot. If the Legislature has not the
power over the means to be used in enforcing a claim, the
extent of which is guarded by constitutional provision, that
"abuses" would result from its impotency is quite obvious.
For instance: It is obvious that it would be oppressive upon
the contractor under the Act of 1862, if he could not collect
assessments except by foreclosure of the lien upon the lot
assessed. The expenses of collecting a medley of small assess-
ments in that way would not only be burdensome to the
contractor but still more so to the lot holder—these evils of
personal consequence leading on to another of general conse-
quence, namely: Enhanced expense in the making of street
improvements, coming of the fact that bids are graduated, to
some extent, with reference to the facility with which dues
may be collected. For these reasons I consider that it was
competent for the Legislature to regulate the municipal power
to assess by making payment of the amount assessed upon
each lot a personal duty on the part of its owner. The ques-
tion was fully considered in *Litchfield* v. *McComber*, 42 Barb.
289, and it was held that the Legislature could add to the

remedy for the collection of street assessments, by lien and foreclosure, a personal action at law.

As to the question whether the Act of 1862 affords the requisite machinery for enforcing payment of assessments by judgments *in personam*, I think that it does. By the seventeenth section of the Act " personal liability for a payment of the assessment" is expressly provided for, and the enforcement of the liability by a personal action is provided for also in section fifteen, which is as follows : "If the expenses of the work and material for such improvements, after the completion thereof be not paid to the contractor so employed, or his agent, or assignee, on demand, the said contractor or his assigns shall have the right to sue the owner, tenant, or occupant, under the provisions of this Act, for the amount contracted to be paid, and the certificate of the Superintendent that the work has been properly done, and that the charges for the same are reasonable and just, shall be *prima facie* evidence of the amount claimed for said work and materials, and of the right of the contractor to recover for the same in such action." By section thirteen proceedings in foreclosure are also authorized " to be governed by this Act, and also by the Civil Practice Act when not in conflict therewith." In this case the plaintiff proceeds against the property assessed and claims a personal judgment for any balance which the lot may fail to pay. In cases where a personal judgment for the whole amount of the tax is the sole purpose of the action, as well as in suits like the present where a personal judgment is claimed for any balance which the sale of the property may fail to pay, there can be no occasion for judicial inquiry as to whether the assessment is in excess of the constitutional limit, viz : the value of the lot; for if in excess then the assessment is unlawful *pro tanto*, and the party will have lost his right by failure to appeal to the Board of Supervisors, or if an appeal has been taken, then by an adverse decision upon it. On these grounds I consider that the judgment should be affirmed.