**MEHUL'S INVESTMENT CORPORATION T/A National Printing & Copying**

v.

**ABC ADVISORS, INC.**

**No. CIV.A. DKC 99–3120.**

United States District Court, D. Maryland.

Feb. 7, 2001.

Onkar N. Sharma, Sharma & Bhandari, Silver Spring, MD, for Plaintiff.

Andrew J. Morris, Mayer, Borwn & Platt, Washington, DC, Anthony W. Hawks, Law Office, Alexandria, VA, for Defendants.

## MEMORANDUM OPINION

CHASANOW, District Judge.

Pending before the court and ready for resolution is the motion for summary judgment of Defendant, ABC Advisors, Inc. ("ABC"). No hearing is deemed necessary, and the court now rules pursuant to Local Rule 105.6. For the reasons that follow, the court shall deny the motion with respect to count I (breach of contract), and grant the motion with respect to all other counts.

## I. Background

The following facts are undisputed or presented in the light most favorable to Plaintiff, Mehul's Investment Corporation t/a National Printing & Copying ("National"). Defendant, ABC, acquires and resells Government Printing Office ("GPO") bid solicitations. ABC "codes" and sorts these solicitations into various "production categories," for instance, copying and duplicating, color copying, saddle stitching, four-color processing, etc. It then sells them to printing companies that have requested work in that specific category. Paper no. 13 at 2. National is a printing company that uses the service of companies like Defendant to bid on GPO contracts.

In 1997, Printers Service, Inc. ("PSI") contracted to provide GPO solicitation bid services for ten years at $1 a month to Bina's Investment Corporation t/a Metro Printing & Copying ("Metro"). Paper no. 1 ("Complaint"), Plaintiff's exhibit 2 at 1 ("1997 agreement").[1] The express terms of the 1997 agreement call for PSI to provide Metro bid solicitations in only one production category, copying and duplicating. Despite this limitation, Metro received copies of GPO solicitations in multiple production categories, as reflected in Metro Printing's "Bid's Unlimited, Inc., Application for Bid Service." Plaintiff's exhibit 2 at 2.[2] ("bid service application"). Additionally, the 1997 agreement contains a clause binding the successors and/or assigns of PSI and Metro.

When the PSI–Metro agreement was executed, PSI was owned by Robert Schlauch and Bhavi L. Vora. The latter also owned Metro. Schlauch explains that PSI provided bid solicitations to Metro in categories other than copying and duplicating because Vora was part owner of PSI, and because Vora invested in PSI's predecessor, Bids Unlimited, Inc., which Schlauch owned. (Robert Schlauch Aff. ¶¶ 3–4).

In 1998, ABC bought all of PSI's stock. However, Schlauch continued as President of PSI under an "outsourcing agreement." See Plaintiff's exhibit 1. The outsourcing agreement obligated ABC to continue to provide PSI clients with bid solicitation service "upon such terms and conditions as Schlauch may approve on behalf of PSI." Id. § 2(b), at 2. It specifically provided that ABC and PSI would continue "to honor the terms and conditions of PSI's ... existing service agreement with Metro Printing and Copying, Inc." Id.

---

1. All of Plaintiff's exhibits are attached to the Complaint.

2. "Bids Unlimited, Inc.," was PSI's former corporate name. See Complaint ¶ 7.

Until March 2, 1999, Metro received from ABC bid solicitations in essentially the same categories that it had received from PSI. *See* Plaintiff's exhibit 2 at 3 ("production categories sheet"). Defendant claims that it stopped its service under all agreements because Metro and Vora were involved in a debarment proceeding that disqualified Metro from being able to bid on GPO contracts.[3]

In April 1999, National purchased Metro. National claims that pursuant to both the 1997 and outsourcing agreements, it had the right to receive GPO bid solicitations from ABC. ABC, however, did not believe that National's purchase of Metro was legitimate. ABC thought that Metro was attempting to avoid debarment by bidding on contracts under a new name, i.e., National.

ABC's counsel wrote a letter, dated March 2, 1999, to Schlauch, among other things, expressing concern regarding Metro's debarment. The letter does not mention National. The March 2 letter spawned a series of letters between counsel for Plaintiff and Defendant. In a letter to National's counsel, dated July 13, 1999, ABC's counsel requested proof that National and Metro were separate entities and that National had the means to perform the tasks for which it sought bid solicitations.[4] Plaintiff's exhibit 6. In another letter, ABC stated that it suspected National was brokering GPO bids. Plaintiff's exhibit 7.

After determining that National and Metro were separate companies, ABC provided National bid solicitation service with respect to copying and duplicating for four months in 1999.[5] National claims that its business viability depends on the bid solicitation service of companies like ABC. Currently, to obtain this service, National has contracted for approximately $1,200 per month with another company, International Bid Service.

## II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505; *see also Pulliam Inv. Co., Inc. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139, 141 (4th Cir.1979); *Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950). The moving party bears the burden of showing that there is no genuine issue of material fact. Fed. R.Civ.P. 56(c); *Pulliam,* 810 F.2d at 1286 (citing *Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979)).

3. Defendant admits that it does not know why Metro was debarred. It opines that the GPO found out that Metro was "brokering," i.e., bidding on and winning contracts that it could not perform, and then subcontracting the work without GPO's knowledge. Paper no. 13 at 4.

4. The items ABC requested include a complete list of National's shareholders, directors and other officers, and any correspondence pertaining to National's qualifications to become a bidder on GPO contracts, as well as a list of all of National's equipment and any subcontractors it used. Plaintiff's exhibit 6 at 2–3.

5. It appears that ABC no longer provides any bid solicitation service to National. ABC claims it "resumed" furnishing GPO solicitations involving copying and duplicating services in August 1999. Paper no. 13 at 4. National states, however, that "ABC has failed and/or refused to provide to National, GPO bid service since April 1999, except for four (4) months in August 1999 ...." Paper no. 15 at 2.

When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Tinsley v. First Union Nat'l Bank*, 155 F.3d 435, 437 (4th Cir. 1998). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505.

In *Celotex*, the Supreme Court stated:

In cases like the instant one, where the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the "pleadings, depositions, answers to interrogatories, and admissions on file." Such a motion, whether or not accompanied by affidavits, will be "made and supported as provided in this rule," and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. However, " 'a mere scintilla of evidence is not enough to create a fact issue.' " *Barwick v. Celotex Corp.*, 736 F.2d 946, 958–59 (4th Cir.1984) (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C.1966), *aff'd*, 388 F.2d 987 (4th Cir.1967)). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

### III. Analysis

#### A. Breach of Contract

■ ABC claims that National has no standing to assert contract rights in this matter because the 1997 agreement, the bid service application and the production categories sheet are all non-assignable personal services contracts. The court disagrees. The Court of Appeals of Maryland has held that:

In the absence of a contrary provision— and there was none here—rights and duties under an executory bilateral contract may be assigned and delegated, subject to the exception that duties under a contract to provide personal services may never be delegated, nor rights be assigned under a contract where *delectus personae* [choice of the person [6]] was an ingredient of the bargain.

*Macke Co. v. Pizza of Gaithersburg, Inc.*, 259 Md. 479, 482, 270 A.2d 645, 646–47 (1970) (citing 4 Corbin on Contracts § 865 (1951) at 434; 6 Am.Jur.2d, *Assignments* § 11 (1963) at 196).

■ In its memorandum in support of its motion, ABC contends that it adds value to GPO solicitations by coding, sorting and distributing them to printing companies. Even so, the contract between the parties here is distinguishable from a typical personal services contract, such as a contract to paint a portrait, write a novel, or perform other work requiring "rare genius" and "extraordinary skill." *Macke*, 259 Md. at 484, 270 A.2d at 648. (citing *Taylor v. Palmer*, 1866 WL 830, 31 Cal. 240, 247–48 (1866)).

As set forth below, cases cited by ABC to support its argument that the agreements here are personal enough to invoke the rule of *delectus personae* are unavailing. In *Eastern Advertising Co. v. McGaw*, 89 Md. 72, 42 A. 923, 926 (1899),

**6.** Black's Law Dictionary 425–26 (6th   ed.1990).

the Court of Appeals refused to allow an advertising agency to delegate its duties under a contract, which had been entered into by a company that relied on the agency's personal skill, judgment, and taste in selecting which of the company's business cards would be carried on railway cars. There is no evidence in the record that Metro or National relied on PSI or ABC's personal taste, judgment or skill with respect to the work required under any of the agreements at issue in this case. ABC offers no proof that another company could not code, sort and distribute bid solicitations in the exact same manner that it does.

*Berliner Foods Corp. v. Pillsbury Co.*, 633 F.Supp. 557, 559 (D.Md.1986), is distinguishable because it involved a distribution agreement. When such contracts are silent as to assignment rights, they cannot be assigned unilaterally without the prior consent of the non-assigning party.

While still distinguishable, *Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 128 A. 280, 282–83 (1925), is most analogous to the case at bar. In that case, the Court of Appeals of Maryland held that the right of an individual to purchase ice under a contract, which by its terms reflected a knowledge of the individual's needs and reliance on his credit and responsibility, could not be assigned to Crane, which purchased his business. The court in *Crane* largely was concerned that the assignment would change significantly the responsibilities of the appellee ice supplier, as the assignor was an individual while Crane was a large multi-state company. ABC has presented no evidence that the demands of Metro and National are significantly different.

The court in *Crane* found that the supplier in that case entered into the contract to deliver ice, in part, because of its personal knowledge of the business needs and responsibility of the other contracting party. In this case, Schlauch claims that he only entered into the 1997 agreement with Metro because Vora, his business partner

and Metro's owner, had invested in PSI. Schlauch essentially asserts that he did not intend for another company to reap benefits from the 1997 agreement. This does not explain, however, why the 1997 agreement states that it is binding on the successors or assigns of both PSI and Metro, if, as Schlauch claims, PSI meant the agreement only to apply to Metro.

Moreover, the contract in *Crane*, or in any of the cases cited by ABC, failed to mention assignment rights or even show that an assignment had been contemplated by the parties. *See Crane*, 128 A. at 281 (The contract did not "contain any word, such as assigns, to indicate that the parties contemplated an assignment by either."). The 1997 agreement in this case, signed by Schlauch and Vora specifically provides that "[t]his Agreement shall be binding on the successor and/or assigns of the undersigned parties." National is Metro's successor. Thus, unlike the above-cited cases, the parties here arguably contemplated that Metro or PSI might assign their rights under the contract or sell their companies and that their assigns and successors would be bound by the contract.

1. *National's rights under the 1997 agreement*

When interpreting contacts, courts give words their customary and normal meaning. *Government Employees Ins. Co. v. DeJames*, 256 Md. 717, 720, 261 A.2d 747, 749 (1970) (citing *State Farm Mut. Auto Ins. Co. v. Treas.*, 254 Md. 615, 255 A.2d 296 (1969); *American Home Assurance Co. v. Erie Ins. Exchange*, 252 Md. 116, 248 A.2d 887 (1969); *Offutt v. Liberty Mut. Ins. Co.*, 251 Md. 262, 247 A.2d 272 (1968); *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.*, 248 Md. 148, 151, 235 A.2d 556 (1967)). Absent ambiguity, the court will determine the meaning of the contract's language. *Id.* Language general in nature or imprecisely defined, is not necessarily ambiguous. *Truck Ins. Exchange v. Marks Rentals Inc.*, 288 Md. 428, 433, 418 A.2d 1187, 1190 (1980) (citing

*Allstate v. Humphrey*, 246 Md. 492, 496, 229 A.2d 70 (1967)). Ambiguity arises only where a reasonably prudent man could glean more than one interpretation from a contract's language. *Id.* (citing *C & H Plumbing v. Employers Mut.*, 264 Md. 510, 515, 287 A.2d 238 (1972); *Aetna Cas. & Surety Co. v. Brethren Mut. Ins.*, 38 Md.App. 197, 205, 379 A.2d 1234 (1977), *cert. denied*, 282 Md. 730 (1978); *Della Ratta, Inc. v. American Better Community Developers*, 38 Md.App. 119, 130, 380 A.2d 627 (1977)). If ambiguity arises, then the parties may introduce extrinsic evidence to show their intention. *Id.* (citing *Burroughs Corp. v. Chesapeake Petroleum and Supply*, 282 Md. 406, 411, 384 A.2d 734 (1978)). Only if the evidence pertaining to ambiguity raises a factual dispute does the contract's construction go the trier of fact. Otherwise, construction is for the court. *Id.* (citing *DeJames*, 256 Md. at 720, 261 A.2d 747; *Ebert v. Millers Mut. Fire Ins. Co.*, 220 Md. 602, 610, 155 A.2d 484, 488 (1959); 22 Appleman, Insurance Law and Practice § 12853 (1979); *Winterwerp v. Allstate Ins. Co.*, 277 Md. 714, 717, 357 A.2d 350 (1976); *Humphrey*, 246 Md. at 496, 229 A.2d 70).

■ Defendant contends that the language of the 1997 agreement binds Plaintiff but does not "inure to the benefit" of Plaintiff. Paper no. 13 at 7. It essentially argues that Plaintiff can not enforce the 1997 agreement.

In *Crown Oil and Wax Co. of Delaware, Inc. v. Glen Constr. Co. of Virginia, Inc.*, 320 Md. 546, 562, 578 A.2d 1184, 1192 (1990), the Court of Appeals of Maryland, examining a contract containing general language on successor rights similar to the 1997 agreement, held that a successor company could enforce the contract between its predecessor and the defendant. The language regarding successor rights in *Crown*, provided that each company "binds himself . . . his successors, [and] assigns . . . to the partners, successors, [and] assigns, . . . of such other party in respect to all . . . obligations contained in

the Contract Documents." *Id.* at 557, 578 A.2d at 1189. Crown Inc., ("Crown") had entered into a construction contract with Glen Construction Company of Virginia ("Glen"). *Id.* at 551–52, 578 A.2d at 1186. The contract stated that the parties would arbitrate legal disputes. *Id.* at 549, 578 A.2d at 1185. Frederick Hotel Limited Partnership ("FHLP") acquired Crown's interests under the contract. *Id.* at 564, 578 A.2d at 1192. The appellate court determined that "[t]he covenants include the agreement to arbitrate. FHLP is a successor of Crown Inc. within the meaning of the construction contract, so that Glen has agreed to arbitrate with FHLP." *Id.* Much of the court's analysis in that opinion focused on whether FHLP, in fact, was a successor of Crown. Both parties in the case now before the court agree that Plaintiff is Metro's successor. The court finds no discernable difference between the language in the 1997 agreement and the language in the contract in *Crown*. Just as FHLP could enforce the contract against Glen in *Crown*, so too Plaintiff could have enforced the 1997 agreement against PSI.

■ While acknowledging that Plaintiff is Metro's successor, Defendant contends that it (ABC) is not PSI's successor. Thus, Plaintiff cannot enforce the 1997 agreement against it. However, Defendant may have adopted the 1997 agreement by its own conduct, and be bound by its terms. Under Maryland law:

The general rule is that one cannot be held to a contract to which he is not a party. *Snider Bros., Inc. v. Heft*, 271 Md. 409, 414, 317 A.2d 848 (1974), *and Crane Ice Cream Co. v. Terminal Freezing & Heating Co.*, 147 Md. 588, 593, 128 A. 280 (1925). However, a party may later accept or adopt a contract and thus be bound by it. *Snider*, 271 Md. at 414, 317 A.2d 848 *and Stavrou v. Beacon Elec. Supply*, 249 Md. 451, 456, 240 A.2d 278 (1968). Thus, what constitutes acceptance becomes the threshold question. Acceptance can be accomplished

by acts as well as words; no formal acceptance is required. *Duplex Envelope Co. v. Balto. Post Co.*, 163 Md. 596, 605, 163 A. 688 (1933). Notification of acceptance is not essential to the formation of a contract. *Chesapeake, etc. v. Manitowoc*, 232 Md. 555, 567, 194 A.2d 624 (1963).

*Porter v. General Boiler Casing Co., Inc.*, 284 Md. 402, 410, 396 A.2d 1090, 1094 (1979). *See also Snider*, 271 Md. at 414–15, 317 A.2d at 851–52 (holding that a non-signatory to a contract could be held liable for breach of that contract after she signed other writings indicating an intent to be bound); *Whitmore v. Hawkins*, No. 99–1443, 2000 WL 828285 (4th Cir. June 27, 2000) ("Under Maryland law a party can be bound to a contract that it did not sign when the evidence unequivocally indicates that the non-signatory intended to be bound by the contract.") (citing *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md.App. 294, 728 A.2d 783, 784 (1999), *cert. denied*, 355 Md. 613, 735 A.2d 1107 (1999); *Porter*, 284 Md. at 411, 396 A.2d at 1095).

Defendant signed the outsourcing agreement, which arguably showed its intent to be bound by the 1997 agreement. Further, Defendant determined that the 1997 agreement gave Plaintiff rights to its bid solicitation service, which it provided for four months in 1999. Thus, Defendant's own conduct may have been sufficient to bind it to the 1997 agreement. Whether Defendant adopted or accepted the contract is for the trier of fact to determine. *Porter*, 284 Md. at 415, 396 A.2d at 1097.

2. *National's rights under the bid service application and production categories sheet*

Plaintiff further appears to argue that it is entitled to receive bid solicitations involving production categories other than copying and duplicating. The court disagrees. The 1997 agreement clearly pertains to one category of bid solicitation service. PSI and Defendant also provided Metro service in other production categories, pursuant to the bid service application and the production categories sheet, respectively. Defendant explains that Schlauch was willing to provide Metro with solicitations in categories other than copying and duplicating because Metro was next door to PSI so shipping expenses were nonexistent. This does not explain, however, why Defendant also provided such service to Metro although the two companies were not next door to each other.

Nevertheless, Defendant contends that the bid service application and the production categories sheet were month-to-month agreements and could be cancelled by either party at any time. Plaintiff argues that these agreements were part of 1997 agreement. The face of the 1997 agreement lists only the single production category of copying and duplicating. Plaintiff fails to explain why the agreement was drafted in this manner if it was meant to encompass multiple categories.

Moreover, to the extent that Defendant adopted or accepted the 1997 agreement, it appears only to have done so with respect to supplying bid solicitations involving copying and duplicating. Defendant asserts, and Plaintiff does not dispute, that it is not a successor of PSI. Thus, Defendant is obligated under the 1997 agreement only to the extent that it accepted or adopted it. Defendant unilaterally began providing service to Plaintiff in 1999 in one production category. *See* Plaintiff's exhibit 7 (letter from Defendant's counsel explaining that the 1997 agreement only pertains to the formal category of copying and duplicating). Thus, any claim Plaintiff has against Defendant with respect to the 1997 agreement is limited to that production category.

**B. Unjust enrichment**

To state a claim for unjust enrichment in Maryland, National must show that: (1) it conferred a benefit on ABC; (2) ABC appreciated or had knowledge of

the benefit; and (3) ABC retained the benefit under such circumstances that make it inequitable unless ABC pays National the value of the benefit. *Berry & Gould v. Berry,* 360 Md. 142, 151–52, 757 A.2d 108, 113 (2000) (*County Comm'rs v. J. Roland Dashiell & Sons, Inc.,* 358 Md. 83, 95 n. 7, 747 A.2d 600, 607 n. 7 (2000) (quoting *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28, 31 (1980))).

■ National claims that ABC has been unjustly enriched because it is selling to other companies GPO bid service that belongs to National. National argues that the proceeds from the bid solicitation service constitute a benefit to ABC. Complaint ¶ 26. However, National fails to allege that it actually conferred this benefit on ABC. *See Froelich v. Erickson,* 96 F.Supp.2d 507, 524 (D.Md.2000) ("To sustain an unjust enrichment claim [in Maryland], a plaintiff must have provided an actual benefit to the defendant."); *Seafarers Welfare Plan v. Philip Morris,* 27 F.Supp.2d 623, 635 (D.Md.1998) (dismissing claim, as plaintiffs failed to show that it conferred a benefit on defendants); *Crosby v. Crosby,* 769 F.Supp. 197 (D.Md.1991) (holding that, among other reasons, because first wife conferred no benefit on second wife, who, instead of first wife, was receiving deceased husband's pension benefits, claim of unjust enrichment failed); *Everhart v. Miles,* 47 Md.App. 131, 137, 422 A.2d 28, 31 (1980) (explaining that when appellees moved, leaving behind repairs to and improvements on appellants' land, the latter were unjustly enriched as they benefitted from appellees' labor).

In the present case, National cites no authority, and the court has found none, to support its argument that ABC's own proceeds constitute a benefit for purposes of an unjust enrichment claim. Maryland law appears to require that the plaintiff provide a service or benefit to a defendant for which the plaintiff is not compensated, *see generally Froelich,* 96 F.Supp.2d at 524, or that the defendant obtains and fails to return funds or property that belong to

the plaintiff, *see e.g., Plitt v. Greenberg,* 242 Md. 359, 219 A.2d 237 (1966) (plaintiff had colorable claim for unjust enrichment after his own check was fraudulently endorsed over to defendant, who refused to return the money). National alleges neither that it conferred an actual benefit or provided a service to ABC for which it was not compensated, nor that ABC obtained and refused to return National's funds. Consequently, its unjust enrichment claim fails.

### C. False Disparaging Statements

■ National claims that ABC published false and disparaging statements about its business practices. In a letter to Schlauch dated March 2, ABC stated that Metro is attempting "to avoid the effect of the debarment" by selling its assets to another entity. Plaintiff's exhibit 3. While National is not named, it is undisputed that National is the "other entity" to which the letter refers. In additional correspondence, ABC requests proof that National and Metro are separate entities and that National can perform the tasks for which it seeks bid solicitations, and further states that it suspects National of brokering GPO bid solicitations.

National's complaint refers to this claim as one of "False Disparaging Statements." Complaint at 12. In Maryland, however, this cause of action is more properly termed "injurious falsehood." *See e.g. Beane v. McMullen,* 265 Md. 585, 607–08 291 A.2d 37, 49 (1972); Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland § 3.42 (1991) (case citations omitted). In *Beane,* the Court of Appeals defined the cause of action.

> Injurious falsehood, or disparagement, ... consists of the publication of matter derogatory to his business in general ... of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage. The falsehood must be communicated to a third person, since the tort consists of interference with the relation of such persons ...

[T]he plaintiff must establish its falsity as part of his cause of action. In addition, the plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damage. [There is no liability where the defendant's statements were made in good faith], even though he may have been negligent in ascertaining the facts before he made it.

*Id.* (citing Prosser, Law of Torts, at 919–922 (4th ed.1971)). *See also Nat'l· Bd. of Certification in Occupational Therapy, Inc. v. American Occupational Therapy Ass'n,* 24 F.Supp.2d 494, 511 (D.Md.1998) ("The plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he had suffered special damage.") (citation omitted); *Rite Aid Corp. v. Lake Shore Investors,* 298 Md. 611, 623, 471 A.2d 735, 741 (1984) (citing 1981 WL 167402, 4 A.L.R. 4th 532 (1981)) (nationally the cases are in accord that "the injured party can recover only for pecuniary loss resulting from the disparaging words or material . . . .")

National has failed to show that the letters interfered with its business relations with a third person. The tort requires that the falsehood be made to a person, who because of the statements, refuses to do business with the plaintiff. National's counsel was the only person who received the letters in which it was expressly named. Moreover, National presents no evidence that any of the letters induced another entity to cease doing business with it, and as a result, that it suffered any special damages. Thus, National's claim of injurious falsehood fails.[7]

**D. Tortious Interference with Business Relations**

■ National argues that ABC interfered with two of its business and contractual relations: (1) its contract of sale with Metro, and (2) its business relationship with GPO. Complaint ¶¶ 36–37. A plaintiff may bring a claim of interfering with business relationships under two theories: (1) inducing the breach of a specific existing contract with a third party, which National fails to show occurred with respect to either the contract of sale with Metro or any GPO contract; and (2) interfering with economic relationships in the absence of a breach of contract. *Natural Design, Inc., v. Rouse Co.,* 302 Md. 47, 69, 485 A.2d 663, 674 (1984). The elements of the latter include "(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs· in their lawful business; (3) done with the unlawful purpose to cause such damage and loss . . . and (4) actual damage and loss resulting." *Id.* at 70–71, 485 A.2d at 675 (quoting *Willner v. Silverman,* 109 Md. 341, 355, 71 A. 962 (1909) (quoting *Walker v. Cronin,* 1871 WL 5416, 107 Mass. 555 (1871))).

■ National argues that ABC refused to provide it with bid solicitation service in an effort intentionally to interfere with its business relationships with Metro and GPO. The record does not support this contention. The letters from ABC's counsel show that the company refused to provide bid service because it believed that National's purchase of Metro was a scheme to get around the effects of Metro's debarment, not because ABC sought to interfere with National's business relationships with a third party.

■ In *K & K Mgmt., Inc. v. Lee,* 316 Md. 137, 557 A.2d 965 (1989), the Court of Appeals of Maryland rejected an argument similar to the one National advances. The plaintiffs in that case argued that their business relationships were affected when the defendants breached their leasing

---

7. ABC also contends that its statements were privileged because it acted in good faith. Paper no. 13 at 11. The court need not reach this issue as Plaintiff's claim fails for the reasons explained in the text of the opinion.

agreement. *Id.* at 154, 557 A.2d at 973. The court determined that a defendant's breach of contract might have multiple effects. *Id.* at 158, 557 A.2d at 975. However, a plaintiff must show that the purpose of the breach was to interfere with the plaintiff's business relationships. The defendant does not commit the tort if interference with plaintiff's business relations is simply an incidental effect of the defendant's action. *Id.* at 162, 557 A.2d at 977 (The Lees' loss of that business ... was an incidental effect of appellants' breach of the Agreement and not the object or purpose of the breach.). This is so even if such interference is a foreseeable consequence of the breach. *Id.* at 168, 557 A.2d at 980.

The record in this case shows that any interference on ABC's part with National's business relations with GPO was an incidental result of ABC's refusing to provide bid service. In other words, the fact that National could not bid on GPO contracts because of ABC's actions is an incidental consequence of any breach of the 1997 agreement that ABC may have committed. Thus, to the extent ABC wronged National, the proper cause of action is for breach of contract. *Cf. id.* at 169–70, 557 A.2d at 981 ("If breach of the ... contract were treated as an improper means which overrides the lack of motive to interfere ... then the interference tort becomes boundless and only rarely would the breach of a commercial contract fail to be a tort as well.").

### E. Discriminatory Business Practices

While the basis for Plaintiff's claim of Discriminatory Business Practices is absent in the complaint, National appears to argue in its memorandum in support of its opposition motion that ABC violated the Clayton Act, § 2(a), as amended by the Robinson–Patman Price Discrimination Act, 15 U.S.C. § 13(a) ("Robinson–Patman Act").[8]

█ The Robinson–Patman Act deals with price discrimination, and its purpose is "to increase competition by regulating large buyers' economic power." *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 163 (4th Cir.1999); *see also Hinkleman v. Shell Oil Co.*, 962 F.2d 372, 380 (4th Cir. 1992) ("Congress sought through the Robinson–Patman Act to maximize consumer welfare by enacting statutes intended to prohibit anticompetitive behavior.").

█ To establish a prima facie case of price discrimination under the Robinson–Patman Act, a plaintiff must show: (1) a seller sold the same product at different prices to different purchasers, ... and (2) such differences in price reasonably may cause an injury to competition. *Hoover*, 199 F.3d at 163 (citing *FTC v. Anheuser–Busch, Inc.*, 363 U.S. 536, 550, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); *Falls City Indus., Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 435, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983)).

█ National does not argue that ABC's pricing is discriminatory or present any argument as to the effects of its pricing on competition. It argues instead that because of the national origin of National's owners, ABC made its "GPO bid service to

---

8. The Act provides:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them ....

15 U.S.C. § 13(a).

National contingent upon National's submission of its ownership, financial and technical capability qualifications ...." Complaint ¶¶ 45–46. The record does not support this argument. As explained earlier, because of Metro's debarment, ABC requested, among other things, proof from Metro and National that those companies were separate entities. *See* Plaintiff's exhibit 6, 7, 8. There is no evidence that ABC's requests had anything to do with the national origin of National's owners. Moreover, these allegations fail to establish a prima facie case under the Robinson–Patman Act.[9]

## IV. Conclusion

For the foregoing reasons, Defendant's motion is denied in part, with respect to count I (breach of contract), and granted as to all other counts.

A separate Order will be entered.

---

9. The parties dispute whether ABC's bid solicitation service is a "commodity" within the meaning of the Robinson–Patman Act. The court's analysis regarding this claim obviates the need to determine this issue.