THE EASTERN ADVERTISING COMPANY, Use of the Southern Street Railway Advertising Company of Baltimore City, *vs.* GEORGE K. McGAW & CO.

*Assignment of Contract Involving Personal Skill—Assignment of Contract to Display Advertising Cards—Pleading—General Issue.*

A plea which gives color to the plaintiff's declaration but makes defence by setting up new matter in avoidance is not a plea amounting to the general issue and therefore liable to demurrer, although such new matter may be admissible in evidence under the general issue plea.

A contract by which one party agrees to do work for another, when trust is reposed in the skill and knowledge of the person employed to do the work, cannot be assigned by the latter without the consent of the other party so as to entitle the assignee to do the work and recover the contract price.

By contract between the defendants and the E. Company, it was
agreed that the E. Company should carry the advertising cards of
the defendants in the street railway cars of Baltimore City for one
year for certain compensation.   The cards were to be approved by
the company as to style and contents, and it was stipulated that the
contract should terminate if the E. Company should cease to have
the right to maintain the advertisements.   In the course of perform-
ance, the E. Company notified defendants that it had sold all its
interest in the business to plaintiff, another company.   Defendant
notified the E. Company of their refusal to assent to the assignment
of the contract.   Plaintiff Company subsequently carried the adver-
tising cards of the defendant and sued to recover the amount
claimed to be due for services rendered after the assignment. *Held*,
That since the contract required the exercise of the judgment and
taste of the E. Company in the designing of the advertising cards
and their arrangement in the cars, the contract could not be assigned
to the plaintiff without the consent of the defendants, and the plain-
tiff company cannot recover for services it had not been employed
to render; nor can a recovery be had in the name of the E. Com-
pany since the contract was terminated upon a cessation of its right
to maintain the advertisements.

Appeal from the Baltimore City Court (DENNIS, J.), where
the case was tried before the Court without a jury.

The case was argued before McSHERRY, C. J., BRISCOE,
PAGE, PEARCE and SCHMUCKER, JJ.

*W. Burns Trundle*, for the appellant.

The Southern Company performed the contract of the
Eastern Company during the month of September, with
the sanction and authority of the Eastern Company; and
so doing by the authority of the Eastern Company, it was
acting on behalf of that company in performing for it the
obligation of the contract which was in full force.   It can
make no difference to the defendant to whom the money
for the work was to be paid.   It was, therefore, error to
reject the plaintiff's second prayer, which required the Court
to find as facts that by the authority of the plaintiff the
Southern Company undertook to perform the contract on
behalf of the plaintiff and did perform it during the month
of September, 1897, and that the plaintiff did not assign
the contract.

Assuming that the contract of the Eastern Company with the defendants was assigned, although there is no direct evidence to that effect in the record, then the plaintiff's fifth prayer should have been granted.   By that prayer the Court was asked to rule as matter of law that the contract sued on in this case is not personal to the parties thereto, and that the plaintiff had the legal right to assign the same and that the right of the plaintiff through and by its assignee, to maintain its advertisements in the cars did not cease or determine.   The general rule is that contracts other than such as are personal in their character, as promises to marry or engagements for personal services requiring skill, science or personal qualifications may be assigned.   *Devlin* v. *Mayor*, 63 N. Y. 17.

In *New England Iron Co.* v. *Gilbert Elevated R. R. Co.* 91 N. Y. 153, the plaintiff contracted with the defendant to build for it an elevated railroad in New York City for $735,000 per mile, from Chambers street to Forty-second street.   During the performance of the contract, in October, 1873, the plaintiff conveyed all its property to three trustees for benefit of its creditors.   On 24th November, 1875, the trustees re-assigned to the plaintiff.   In February, 1876, the defendant contracted with another corporation to perform the contract.   For this breach plaintiff sued.   The defence was that the assignment of the contract by the plaintiff and the conduct of it by the trustees, released the defendant and justified it in treating the contract as abrogated and rescinded.   The Court said that "the matter of the contract involved no personal relation or confidence between the parties, or exercise of personal skill or science, *for the contractor was a corporation and its work was necessarily to be done through agents or servants.*   There are *no words restraining its* assignment, and the mere fact that the persons representing the contractor *are assignees*, and *not merely agents or servants*, will *not* operate as a rescission of, or constitute a cause for terminating, the contract."   "It could be rescinded by the acts or assent only of both par-

ties, and here there is no evidence that the plaintiff at any time, intended to abandon or dissolve it." *Ib.*

It is difficult to conceive how the notion of " personal service " can be predicated of a corporation, an artificial entity, which can act only through natural agents. The plaintiff could not in person enter the cars of the street railway companies, and put the defendant's cards in the racks over the windows, and check them up, and see that they were kept there ; this it could only do through and by its agents. The fact that the plaintiff's part of the contract was to be done by an agent or agents was then necessarily within the contemplation of the parties to the contract in the beginning. In vain is the contract scanned to find any obligation on the part of the plaintiff, after furnishing the first lot of cards, except to *carry them ;* that is, to see that the car companies carried them.

The contract states, " all cards subject to the approval of the Eastern Advertising Company as to style and contents." The meaning of this is obvious ; not that the Eastern Company, through its agents, had anything to do with composing the style or wording the contents of the cards, but when gotten up by the advertiser, the defendant, the company reserved the power of veto, to guard against the possibility of any unfit matter being exposed to the public gaze in the street cars. The style and contents of the cards as prepared by the defendant being unobjectionable, they were to be inserted in the racks, in the cars, and then carried. The contract however, states, the " first lot of cards from type in one text and two colors, to be furnished by the Eastern Advertising Company," and the lower Court refers to this as showing that the defendant had the right to rely upon the personal services of the plaintiff. The proof shows that this had already been done by the agents of the plaintiff at the inception of the contract, 1st April, 1897, so that there was nothing *to be done* by the plaintiff, or its assignee, thereafter in the way of furnishing cards. But is it true that there is, in the nature of things, anything personal in fur-

nishing cards from type in one text and two colors, which
one corporation, through its employees, might be supposed
to do better than another corporation might? If it was
*not* done at all, or *improperly* done, that might be a ground
of defence upon the score of non-performance of contract.
What is it " to furnish the cards?" Simply to provide the
cardboard of the proper size, 11 by 21 inches. " From
type." What from type? The lettering of course. Who
is to furnish the lettering? Not the plaintiff, but the defen-
dant; it is to be *his* advertisement. Not to be done with
any embellishment, but simply from type; which, it being
his line of business, a printer, as agent or sub-agent of plain-
tiff, must be called upon to do—in two colors, the colors
not specified. Why the printer would be supposed to print
them any better, when requested by an agent of the plain-
tiff, than he would when requested by *the same person* (Ber-
mingham), as agent for the equitable plaintiff, the assignee,
it is difficult to conceive. The distinction between contracts
personal, and hence not assignable, and contracts not per-
sonal, and hence assignable, rests upon no such shadowy
foundation, as an examination of the authorities will show.

A leading English case, analogous in principle to this, is
*The British Wagon Co. and the Park Gate Wagon Co.* v.
*Lea & Co.*, L. R. 5 Q. B. D. 149. This action was brought
by the plaintiffs to recover rent for the hire of certain rail-
way wagons alleged to be payable by the defendants to the
plaintiffs. By an agreement in writing of 10th February,
1874, the Park Gate Wagon Co. let to the defendants, coal
merchants, 50 railway wagons for a term of seven years at
a yearly rent of £600 a year, payable in equal quarterly
payments. By a second agreement of 13th June, 1874, the
company let to the defendants in like manner 50 other
wagons, at a yearly rent of £625, payable quarterly. Each
agreement contained the following clause: " The owners,
their executors or administrators, will at all times during
said term, except as herein provided, keep the said wagons
in good and substantial repair and working order on receiv-

ing notice from the tenant of any want of repairs, and the number or numbers of the wagons requiring to be repaired, and the place or places where it or they then is or are, will, with all reasonable dispatch, cause the same to be repaired and put into good working order." It was held that the contract was assignable.

In *Galey* v. *Mellon*, 172 Pa. St. 443, Mellon contracted in writing with Samuel Galey, to drill a well for oil or gas on a farm in Washington County. By the contract, Galey was to furnish all tools, cables, &c., at his own expense and risk, and the full labor and hauling required in completing the well and case it dry to water. Mellon was to furnish wood, rig, casing, machinery and water and pay ninety cents per foot for the drilling. Galey, in consideration of $180, made a parol assignment of the contract to Smith Brothers, who were experienced contractors and drillers, and who did the work under the contract. Smith Brothers were not sub-contractors. Defendant claimed that one of the wells drilled was defective, by neglect of the superintendent of Smith Brothers, and that Galey had no right to assign the contract to Smith Brothers. FELL, J., said: "This action is founded upon contract for drilling an oil well. The personal performance of the work by the legal plalntiff could not have been contemplated by the parties at the time the contract was made. The work of necessity required the labor and attention of a number of men, and it does not appear that because of his knowledge, experience or pecuniary ability, or for any other reason, Galey was especially fitted to carry it on. There was nothing of a personal nature about it, and the personal performance by him was not the inducement nor of the essence of the contract. The contract was assigned to Smith Brothers, and the work under it was done by them, with the knowledge of the defendants, from the beginning. The jury found they were not sub-contractors, suing upon a contract as to which they had no rights. It was competent for Galey to assign to them the executory contract with all of his rights under it, or after the completion of the work

to assign to them the right to receive the amount due on settlement.    In either event, they had the right to use his name as legal plaintiff, but in neither would their rights rise higher than his.    The action was had on the right of the legal plaintiff to recover, the doors were opened to every defence available against him, and in no aspect of the case was the defendant prejudiced because of the form of the action."

In *Delaware Co.* v. *Diebold Safe and Lock Co.*, 133 U. S. 473, the assignment to plaintiff was of *part* of the contract. The Court says :  " The case does not require us to consider whether an assignment of the entire contract for the construction of the jail would have been consistent with the intention of the parties as apparent upon the face of the contract, or with the intention of the Legislature as manifested by the statutes under which the contract was made.    The plaintiff claims under *no such assignment*."    In *Burck* v. *Taylor*, 152 U. S. 634, there was a contract between the State of Texas and certain parties for the building of its capitol.    The contract expressly provided that it should not be assignable without the consent in writing of the Governor of the State and the Capitol Building Commissioners.    Several assignments were made *with that consent*, but the assignment under which the plaintiff in error claimed was without any such assent, which was held fatal.

The case of *Griffith* v. *The Tower Publishing Co., Limited, and Moncrief* [1897], 1 Ch., p. 21, relied on by the defendant below, was a bill for an injunction to restrain the assignment of a contract.    Plaintiff, who was the author of certain novels, entered into an agreement with the defendant company for their publication.    By the contract, the company agreed (1), to find the money ; (2), take all risks; (3), and only charge actual out-of-pocket costs of printing and advertising, and (4), to hand to the plaintiff one-half of the ascertained profits, he furnishing the manuscript of the story called " The Angel of the Revolution."    Upon the authority of *Stevens* v. *Benning*, 1 K. & J., 168 ; *Reade* v. *Bent-*

*ley*, 3 K. & J., 271, and *Hale* v. *Bradbury*, 12 Ch. D. 886, MR. JUSTICE STIRLING held that the contract was personal and not assignable.

In *Stevens* v. *Benning*, VICE-CHANCELLOR SIR W. PAGE WOOD, with reference to the contract in that case, which was similar to the one in *Griffith* v. *Tower Publishing Co.*, says : " It is not merely a question of his literary interests, but certain publishers undertaking to incur the expense of bringing out the work, and fixing the price, the author is to have a share of the profits, and they are to decide in what shape the book is to come out, and at what price it is to be sold, and are to account to him.   I must say, that, in my opinion, these are peculiarly personal considerations ; and that this contract bears the impress of being a personal contract in all these respects."   It is impossible not to distinguish such a case as that from the one at bar.

In *Reade* v. *Bentley*, 3 K. & J. 271, the contract was : " It is agreed that the said Richard Bentley shall publish, at *his own expense* and risk, a work at present entitled " Pegg Woffington," and, after deducting from the produce of the sale thereof the charges for printing, paper, advertisements, embellishments (if any), and other incidental expenses, including the allowance of 10£ per cent. on the gross amount of the sale for commission and risk of bad debts, the profits remaining of every edition that shall be printed of the work are to be divided into two equal parts, one moiety to be paid to the said Charles Reade, Esq., and the other moiety to belong to said Richard Bentley."   The suit was by Reade against Bentley to enjoin the publication of a cheap edition of the book, which was refused.   *Hale* v. *Bradbury*, 12 Ch. D. 886, presented the question as to whether, under the facts of that case, there had been an assignment of the copyright by the authors of a certain book called " A Little Tour in Ireland," does not touch the point here.

Many of the cases on this subject turn upon the old common law rule, which forbade the assignment of a right of

action, and have no application where, as here, the suit is brought by the contracting party, suing for the breach, to the use of the assignee. In such case the rule is thus stated in *Wharton on Contracts*, sec. 848 : " When the assignee of an executory contract can perform the duty imposed by it as effectually as the assignor, the fact that this duty is personal cannot be set up in a suit by *the assignor* on the contract." *British Wagon Co.* v. *Lea*, L. R. 5 Q. B. D. 149 ; *Parsons* v. *Woodward*, 22 N. J. L., 196 ; *Philadelphia v. Lockhard, use of Pyle & Hansell*, 73 Pa. St. 211; *Hampson* v. *Owens, use of Stow*, 55 Md. 583.

In the leading American case of *Devlin* v. *Mayor, &c.*, 63 N. Y., before cited, one Hackley made a contract with the city of New York for cleaning the streets during a certain period for a certain price. The contract being still in part executory, Hackley assigned it to Devlin, who tendered himself ready and willing to perform the unexpired part of the contract, which the city refused to allow him to do, claiming that by the assignment the contract was annulled. For that breach Devlin sued in his own name. The Court said : " If the service to be rendered is not necessarily *personal*, and such as can only, and with due regard to the interest of the parties, and the rights of the adverse party, be rendered by the original contractor, and the latter has not disqualified himself from performance, the mere fact that the individual representing and acting for him is the assignee and not the mere servant or agent, will not operate as a rescission, or constitute a cause of terminating the contract."

*Frank Gosnell* (with whom was *T. M. Lanahan* on the brief), for the appellees.

Apart from the provision in the contract, a sale or other disposition by the Eastern Company of its interests in street railway advertising in Baltimore *without the consent of the appellee*, would have terminated the contract between them. It is quite apparent that the services to be performed by the Eastern Company were of a personal nature. Taste,

skill and judgment were required of the Eastern Company, and expected by the appellee in the designing and preparation of the cards, types, &c., and in arrangement of the cards in the cars. No cards could be inserted *unless* approved by the Eastern Company *as to style and contents,* and all payments were to be made to the Eastern Company. The word "assigns" nowhere appears in the contract, thus further precluding any idea of the contract being assignable.

It is well settled that "contracts in which the *delectus personæ* is material, as where a person agrees to use his personal skill and knowledge, and has been contracted with, by reason of the trust and confidence placed in him personally, cannot be assigned by such person, while the agreement is executory, *without the consent* of the other contracting party." 2 *Am. & Eng. Ency. of Law* (2d ed.) pages 1036 and 1037. See also *Sloan* v. *Williams,* 138 Ill. 43, 46; *Stevens* v. *Benning,* 1 Kay & John, 168, 178; *same case on appeal,* 6 D. M. & G. 223; *Hole* v. *Bradbury,* L. R. 12 Ch. D. 886; *Arkansas Smelting Co.* v. *Beldon Co.,* 127 U. S. 387; *Del. Co.* v. *Diebold Safe Co.,* 133 U. S. 488; *Burk* v. *Taylor,* 152 U. S. 651; *Bancroft* v. *Scribner,* (C. C. A.) 72 Fed. Rep. 988; *Hays* v. *Willis,* 4 Daly (N. Y.) 259; *Lamerdon* v. *McCarthy,* 45 Mo. 106; *Henry* v. *Hughes,* 1 J. J. Marsh, 453; *Griffith* v. *Tower Pub. Co.,* [1897] 1 Ch. 21; *Hand* v. *Evans Marble Co.,* 88 Md. 226; *Nat. Bank* v. *Grand Lodge,* 98 U. S. 123; *Keller* v. *Ashford,* 133 U. S. 625.

McSHERRY, C. J., delivered the opinion of the Court.

George K. McGaw and Company entered into a contract with the Eastern Advertising Company on March the nineteenth, eighteen hundred and ninety-seven. By the terms of that contract the Eastern Company agreed to carry in two hundred and fifty cars of the various street railways in Baltimore the advertising cards of McGaw and Company for twelve months, beginning with April the first, at one

hundred and fifty dollars per month.   There are various
provisions contained in the contract, many of which it will
not be necessary to notice.   The advertising cards were to
be " subject to approval of the Eastern Advertising Com-
pany as to style and contents; " and it was stipulated that
' if the Eastern Advertising Company shall cease to have
the right to maintain the advertisement herein specified, this
contract shall terminate, and the other party hereto shall
pay under it only to the time of such cessation."   On the
ninth of September, eighteen hundred and ninety-seven,
McGaw and Company were notified by the Eastern Com-
pany that it had " sold all its street car advertising inter-
est in Baltimore to the Southern Street Railway Advertising
Company."   This notice further stated that " all payments
for advertising from September the first, eighteen hundred
and ninety-seven, should be made to the Southern Street
Railway Advertising Company," and that " all amounts due
for advertising prior to September the first, eighteen hun-
dred and ninety-seven belong to and are payable to "
the Eastern Advertising Company.   The notification con-
cluded with these words : " Thanking you for your past
patronage and soliciting a continuance of the same for our
successors, we are," &c.   Immediately upon the receipt of
this notice the appellees informed the president of the East-
ern Company that they would not accept or assent to the
assignment of their contract.   The appellees had paid to the
Eastern Company every monthly instalment up to September
the first, but they refused to pay to the Southern Street
Railway Advertising Company the sum claimed by it for
the month of September.   Thereupon suit was brought in
the name of the Eastern Company to the use of the Southern
Street Railway Advertising Company against the appellees
for one hundred and fifty dollars, the amount claimed to be
due for the month of September.

The declaration set out in the first count the substance
of the contract and the alleged breach ; whilst the second
count is the ordinary common count for work done and

materials furnished. To this declaration the defendants, McGaw and Company, pleaded the general issue and other pleas not necessary to be noticed, and then a sixth or special plea. To the sixth plea four replications were filed and to these the defendants demurred. The demurrer was sustained and the plaintiff then filed an amended replication, upon which issue was finally joined. The case then proceeded to trial, during the progress of which a single exception to the Court's rulings on the prayers for instructions was reserved. The trial resulted in a verdict and judgment for the defendants and from that judgment the pending appeal was taken. The errors assigned are the ruling on the demurrer and the rulings on the prayers.

It is claimed that as the demurrer filed by the appellees to the four replications to the sixth plea mounted up to the first error in the pleading, the Court should have looked back of the replications and should have stricken down the sixth plea. And it is insisted that the sixth plea should have been ruled bad because it is merely an argumentative denial, and a denial amounting only to the general issue. It is undoubtedly true that if the plea is in effect simply an argumentative denial of the averments of the declaration and is substantially nothing more than the general issue it is defective and ought to have been so declared upon the demurrer to the replications. But there is a great distinction between a plea which amounts to the general issue and a plea which discloses matter that may be given in evidence under the general issue. The general issue is a denial of the whole substance of the declaration, and puts upon the plaintiff the necessity of establishing all the essential allegations of the *narr.* A plea, however, which gives color, express or implied, to the plaintiff's statement—admits that statement to be true—but makes defence by setting up new matter in avoidance, can never be said to amount to the general issue, for the obvious reason that the element of denial is absent. Consequently, "where the defendant elects to plead specially defences in confession and avoidance which

would be admissible in evidence under the general issue, the fact that they are admissible under the general issue does not make his special plea bad." *Poe Pl. sec. 641 (3rd Ed.)*  Now, the sixth plea admits the making of the contract sued on—sets it out in words and figures at large—thus giving express color to the plaintiff's statement; but it then proceeds to aver by way of avoidance that the Eastern Company had sold all its street car advertising interests in Baltimore, including that covered by the contract sued on; that the defendants had entered into the contract on the faith of the reputation acquired by the Eastern Company for tact and skill, judgment and experience, in the preparation and designing of such advertisements; that the defendants had not consented to the sale of this contract to the Southern Street Railway Advertising Company; and that the contract between the Eastern Company and the defendants was cancelled and annulled.  These were matters in avoidance of liability on the contract, and could, even if admissible in evidence under the general issue, be specially pleaded when coupled with the admission that the contract sued on had been executed by the defendants.  The plea was therefore good and was not open to attack by the demurrer.  The four replications were faulty.  No one of them was an answer to the whole plea.  When ruled bad they were combined in one replication and upon it issue was joined.

The two instructions given at the instance of the appellees present distinct theories—the one, that the Eastern Company ceased to have the right to maintain the cards in the cars by reason of the sale to the Southern Street Railway Advertising Company and, therefore, under the terms of the contract no recovery could be had—the other, that the contract sued on is personal to the parties thereto, the *delectus personæ* element forming an ingredient of it, and as the defendants did not assent to its sale or transfer, a recovery cannot be had upon it for the use of one who was not a party to it.  The rejected prayers presented by the plaintiff are founded on directly opposite propositions.  We

may, therefore, discuss the principles which underlie these conflicting contentions without particular reference to the respective prayers and instructions.

With regard to the first instruction but little need be said. Under the explicit terms of the contract if the Eastern Company ceased to have the right to maintain the advertisement of the appellees in the street cars the agreement was terminated and the liability of the appellees to pay was at an end. There was evidence, to which allusion has already been made, tending to show that a sale of all the advertising interests owned by the Eastern Company had been made to the Southern Street Railway Advertising Company; and there was also evidence to the effect that the latter company after this sale claimed to control all advertising in the street car lines in the cities of Baltimore and Washington from September the first, eighteen hundred and ninety-seven. If this evidence be believed, then obviously the Eastern Company ceased to have the right to maintain this advertisement in the street cars of Baltimore, and upon that event happening the liability of the appellees was at an end. It cannot be successfully contended that if the Eastern Company really sold all its interests in the street car advertising business to the Southern Street Railway Advertising Company, the former did not lose the right to maintain the appellees' advertisement in the cars. Unless the appellees assented to this sale and thus made a new contract with the last named company, or unless the contract was one that could lawfully be assigned, when assigned or sold it would not be binding on McGaw and Company. There is no pretence that the appellees assented to the sale. On the contrary the uncontradicted evidence is that they emphatically refused their assent. This brings us to the consideration of the question whether upon a sale of the contract to the new company, the vendee was, despite the protest of the appellees, clothed with authority to perform the undertakings of the Eastern Company, and consequently acquired the right to recover compensation from McGaw and Company.

The legal principle which underlies this question has been thoroughly and fully discussed and decided by this Court in the recent case of *Hand* v. *Evans Marble Co.*, 88 Md. 226. We there said : " In reference to the first question presented, the general rule has long been established, that ' one who is not a party to a contract cannot be included in the rights and liabilities which the contract creates, so as to enable him to sue or to be sued upon it.' 'A man cannot incur liabilities, and again a man cannot acquire rights from a contract to which he is not a party.' *Anson Cont.* 197. Or, as stated elsewhere : ' The rule embodies the principle, in whatever words expressed, that rights founded on contracts belong to the person who has stipulated for them and no other.' *Dicey Parties*, 78. No one can assign his liabilities under a contract without the consent of the party to whom he is liable; and, even where his consent is given, Anson observes (page 205) that ' this is, in effect, the rescission by agreement of one contract and the substitution of a new one, in which the same acts are to be performed by different parties,' and the same is expressed also in *Dicey Parties*, 223, 234. These fundamental principles have been abundantly illustrated in familliar decisions. An illustration of the inability of one to sue on a contract to which he is not a party is found in *Schmaling* v. *Thomlinson*, 6 Taunt. 147, where B. was employed by the defendants, X. & Co., to carry certain goods for them. He delegated the employment to A., the plaintiff, who carried the goods without any communication with X. & Co. It was held that A. could not sue X. & Co. for the work done by him, ' since there was no privity between the plaintiff and the defendants. The defendants looked to B. only for the performance of the work, and he had a right to look to them for payment and no one else had.' " In *Robson and Sharpe* v. *Drummond*, 2 Barn. & Ad. 303, the following facts appeared : Sharpe, a coachmaker, entered into an agreement to furnish Drummond with a carriage, for the term of five years, at seventy-five guineas a year. At

the time of making the contract Robson was a partner with Sharpe, but this was unknown to Drummond, the business being carried on in the name of Sharpe only.   Before the expiration of the first three years the partnership between Sharpe and Robson was dissolved, Sharpe having assigned all his interest in the business and in the contract in question to Robson and the business was afterwards carried on by Robson alone.   Drummond was informed by Robson that the partnership was dissolved, and that he, Robson, had become the purchaser of the carriage then in Drummond's service.   The latter answered that he would not continue the contract with Robson, and that he would return the carriage to him at the end of the then current year, and he did so return it.   An action having been brought in the names of Sharpe and Robson against Drummond for the two payments which, according to the term of the contract, would become due during the last two years of its continuance, it was held that the action was not maintainable, the contract being personal, and Sharpe having transferred his interest to Robson, and having become incapable of performing his part of the agreement.   Lord Chief Justice Tenterden in the course of his judgment said: "After the partnership between Robson and Sharpe had ceased to exist, and after Sharpe had ceased to carry on the business of a coachmaker, the defendant offered to continue the job with Sharpe, but he replied that that was impossible.   Now the defendant may have been induced to enter into this contract by reason of the personal confidence which he reposed in Sharpe, and therefore have agreed to pay money in advance.   The latter, therefore, having said it was impossible for him to perform the contract, the defendant had a right to object to its being performed by any other person, and to say that he contracted with Sharpe alone, and not with any other person." And Parke, Justice, observed: " The contract was to continue for five years.   At the end of the third year there was a dissolution of partnership between Sharpe and Rob-

son, and notice of that dissolution, and of Sharpe having assigned all his interest in the contract to Robson, was given to the defendant, who said he would not continue the contract with Robson.   The very fact of Sharpe's having transferred his interest in the contract to Robson (a mere stranger as far as the defendant was concerned) was equivalent to saying (that which he did afterwards say) I will not perform my part of the contract; and that is an answer to the present action brought in the names of Sharpe and Robson; for the defendant had the right to have the benefit of the judgment and taste of Sharpe to the end of the contract, and which in effect he has declined to supply." The doctrine is concisely stated in *2 Am. & Eng. Ency. Law*, *1036*, (*2d ed.*) in this way : " Contracts in which the *delectus personœ* is material, as where a person agrees to use his personal skill and knowledge, and has been contracted with by reason of the trust and confidence placed in him personally, cannot be assigned by such person while the agreement remains executory, without the consent of the other contracting party."   A large number of cases supporting the text will be found in *note 1*.

It is perfectly obvious that skill and judgment as well as taste were required by the contract to be exercised by the Eastern Company both in the designing of the cards and in selecting the type in which they were to be printed, and in the arrangement of the cards in the cars.   Its approval of the style and contents of the cards was necessary before any card could be placed in the cars.   The contract was one where the *delectus personœ* was most material.   It made no provision for an assignment; and a transfer of it for performance by another was clearly not contemplated by either of the parties to it.   Its sale to the new company gave to that company no authority to execute it without the consent of McGaw; and that consent was refused.   The Eastern Company disabled itself to perform the contract, and a suit in its name to the use of the assignee or vendee gave the latter no right to recover for services it had not

been engaged to render.    There was consequently no
error committed in granting the instruction which embodied
that proposition.    The plaintiff's first, second and fourth
prayers proceeded upon the hypothesis that the Eastern
Company after the sale to the new company did not cease to
have the right to maintain advertisements in the cars in
Baltimore.    There was not only no evidence to support that
hypothesis, but the evidence in the case distinctly refuted
it.    The fifth prayer asked a ruling that the contract sued
on was " not personal to the parties thereto."    What has
already been said shows the propriety of rejecting this
prayer.

As we find no error in the rulings complained of the
judgment appealed against will be affirmed.

> *Judgment affirmed, with costs above
> and below.*

(Decided March 14th, 1899).