## CRANE ICE CREAM COMPANY *vs.* TERMINAL FREEZING & HEATING COMPANY.

*Assignment of Contract—Rights and Liabilities—Sales of Uncertain Amounts.*

As a general rule, a contract cannot be enforced by or against a person who is not a party to it, though there are circumstances under which either of the contracting parties may substitute another for himself in the rights and duties of the contract without obtaining the consent of the other party to the contract.                                    p. 593

Every bilateral contract includes both rights and duties on each side while both sides remain executory.                p. 593

Whether the attempted assignment of the rights under a contract, or the attempted delegation of the duties thereunder, must ·fail because the rights or duties are of too personal a character, is a question of construction to be resolved from the nature of the contract and the express or presumed intention of the parties.                                        p. 594

A contract to supply an individual, during a period of three years, with all the ice needed in his ice-cream business, up to a named amount per week, at a stipulated price per ton, with a provision that he would, to the extent of such named amount, not buy ice elsewhere, was of such a personal nature as not to be assignable by him, as regards either the rights or the liabilities thereunder, to a company, already carrying on the ice-cream business in another city, to which he sold out his business and plant.                                      pp. 594-597

·The inducement for the seller to enter into the contract was obviously its knowledge of the average of ice consumed, and probably to be needed, by such individual buyer, and its confidence in the stability of his enterprise, his competency in commercial affairs, his probity, personal judgment, and continuing financial responsibility.                              p. 597

The possibility that the individual buyer might have expanded his business so as to require the named weekly amount of ice, and that consequently the burden of the contract might have been as onerous to the seller as it could be under the proposed assignment, was immaterial, since the law accords to every man freedom of choice in the party with whom he deals and the terms of his dealing.                            p. 597

One who, by going out of business and selling his plant to another, renders impossible his performance of a contract by which he agreed to buy from the other party thereto all of a certain material needed in his business, thereby repudiated the contract.                                        p. 597

While a party to a contract may as a general rule assign all his beneficial rights, except where a personal relation is involved, his liability under the contract is not assignable *inter vivos,* since one cannot substitute another's liability for his own.                                        p. 598

One who is bound so as to bear an unescapable liability may delegate the performance of his obligation to another, if the liability be of such a nature that its performance by another will be substantially the same thing as performance by the promisor himself, the performance of the third party in such case being the act of the promisor, who remains liable under the contract and answerable in damages if the performance be not in strict fulfillment of the contract.                p. 598

Where an attempt is made, by an assignment of an executory bilateral contract, to transfer the rights and to delegate the duties of the assignor, and the terms and circumstances of the contract make plain that the personal qualification and action of the assignor, with respect to both his benefits and burdens thereunder, were essential inducements in the formation of the contract, the contract cannot be enforced by the assignee.  p. 599

An attempted delegation of the duties under a personal contract, by the making of an assignment, involves a repudiation of any future liability on the part of the assignor.        p. 599

Where one contracting party repudiates his obligations, the other party has the right of declining to be bound to a stranger by its terms.                                        p. 602

*Decided February 26th, 1925.*

Appeal from the Superior Court of Baltimore City (STAN-TON, J.).

Action by the Crane Ice Cream Company against the Terminal Freezing & Heating Company. From a judgment in favor of defendant, plaintiff appeals. Affirmed.

The cause was argued before BOND, C. J., URNER, ADKINS, DIGGES, PARKE, and WALSH, JJ.

*Isaac Lobe Straus* and *J. Paul Schmidt,* with whom was *W. W. Parker* on the brief, for the appellant.

*Clarence K. Bowie,* with whom were *Bowie & Clark* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

The appellee and one W. C. Frederick entered into a contract for the delivery of ice by the appellee to Frederick, and, before the expiration of the contract, Frederick executed an assignment of the contract to the appellant; and on the refusal of the appellee to deliver ice to the assignee, it brought an action on the contract against the appellee to recover damages for the alleged breach. The common counts of the declaration were abandoned, leaving an amended special count on the contract and assignment, to which a demurrer was filed and sustained. It is from the judgment against the appellant on this demurrer that the appeal was taken.

The demurrer admitted the following material allegations: At the execution of the contract, the Terminal Freezing and Heating Company, appellee, was a corporation engaged in the manufacture and sale of ice at wholesale within the State of Maryland, and William C. Frederick made and sold ice cream in Baltimore, where his plant was located. The original contract between these two parties was made on April 2nd, 1917, and ran until April 2nd, 1920. The contract was modified on June 3rd, 1918, by the increase of the original contract price of ice from $2.75 a ton to $3.25, and, before its expiration, the contract was renewed by the parties for another three years, so that the contract was continued until April 2nd, 1923, without change, save as to the higher agreed cost of the ice delivered.

The contract imposed upon the appellee the liability to sell and deliver to Frederick such quantities of ice as he might use in his business as an ice cream manufacturer to the extent of two hundred and fifty tons per week, at and for the price of $3.25 a ton of two thousand pounds on the loading platform of Frederick. The contractual rights of the appellee were (a) to be paid on every Tuesday, during the continuation of the contract, for all ice purchased by Frederick during the week ending at midnight upon the next preceding Saturday; (b) to require Frederick not to buy or accept any ice from any other source than the appellee,

except in excess of the weekly maximum of two hundred and fifty tons; (c) to annul the contract upon any violation of the agreement by Frederick; and (d) to sustain no liability for any breach of contract growing out of causes beyond its control. The converse of these rights and liabilities of the appellee were the correlative liabilities and rights of Frederick under the contract.

There was a further provision that the contract in its entirety should continue in force from term to term, unless either party thereto gave to the other party at least sixty days' notice in writing before the expiration of the term of the intention to end the contract. The contract did not expressly permit or inhibit an assignment, but neither did it contain any word, such as *assigns,* to indicate that the parties contemplated an assignment by either.

Before the first year of the second term of the contract had expired, Frederick, without the consent or knowledge of the appellee, executed and delivered to the appellant, for a valuable consideration, a written assignment, dated February 15th, 1921, of the modified agreement between him and the appellee. The attempted transfer of the contract was a part of the transaction between Frederick and the appellant, whereby the appellant acquired by purchase the plant equipment, rights and credits, choses in action, "good will, trade, custom, patronage, rights, contracts" and other assets of Frederick's ice cream business, which had been established and conducted by him in Baltimore. The purchaser took full possession and continued the former business carried on by Frederick. It was then and is now a corporation "engaged in the ice cream business upon a large and extensive scale in the City of Philadelphia, as well as in the City of Baltimore, and State of Maryland," and had a large capitalization, ample resources and credit, to meet any of its obligations, "and all and singular the terms and provisions" of the contract; and it was prepared to pay cash for all ice deliverable under the contract.

As soon as the appellee learned of this purporting assign-

ment and the absorption of the business of Frederick by the
appellant, it notified Frederick that the contract was at an
end, and declined to deliver any ice to the appellant. Until
the day of the assignment the obligations of both original
parties had been fully performed and discharged.

It may be stated as a general rule that a contract cannot
be enforced by or against a person who is not a party to it,
but there are circumstances under which either of the con-
tracting parties may substitute another for himself in the
rights and duties of the contract without obtaining the con-
sent of the other party to the contract. The inquiry here
is whether the facts bring the case within the scope of the
general rule, and the answer must be found from a consid-
eration in detail of the relation of the parties concerned, the
subject matter of the contract, its terms, and the circum-
stances of its formation.

The basic facts upon which the question for solution de-
pends must be sought in the effect of the attempted assign-
ment of this executory bilateral contract on both the rights
and the liabilities of the contracting parties, as every bilat-
eral contract includes both rights and duties on each side
while both sides remain executory. 1 *Williston on Contracts,*
sec. 407. If the assignment of rights and the assignment
of duties by Frederick are separated, they fall into these two
divisions: (1) The rights of the assignor were (a) to take
no ice, if the assignor used none in his business; but, if he
did (b) to require the appellee to deliver, on the loading
platform of the assignor, all the ice he might need in his
business to the extent of two hundred and fifty tons a week;
and (c) to buy any ice he might need in excess of the weekly
two hundred and fifty tons from any other persons; and (2)
the liabilities of the assignor were (a) to pay to the appellee
on every Tuesday during the continuance of the contract the
stipulated price for all ice purchased and weighed by the
assignor during the week ending at midnight upon the next
preceding Saturday, and (b) not, directly or indirectly, dur-
ing the existence of this agreement, to buy or accept any ice

from any other person, firm or corporation than the said Terminal Freezing and Heating Company, except such amounts as might be in excess of the weekly limit of two hundred and fifty tons.

Whether the attempted assignment of these rights, or the attempted delegation of these duties, must fail because the rights or duties are of too personal a character is a question of construction to be resolved from the nature of the contract and the express or presumed intention of the parties. *Williston on Contracts.* sec. 431.

The contract was made by a corporation with an individual, William C. Frederick, an ice cream manufacturer, with whom the corporation had dealt for three years, before it executed a renewal contract for a second like period. The character, credit, and resources of Frederick had been tried and tested by the appellee before it renewed the contract. Not only had his ability to pay as agreed been established, but his fidelity to his obligation not to buy or accept any ice from any other source up to two hundred and fifty tons a week had been ascertained. In addition, the appellee had not asked in the beginning, nor on entering into the second period of the contract, for Frederick to undertake to buy a specific quantity of ice, or even to take any. Frederick simply engaged himself, during a definite term, to accept and pay for such quantities of ice as he might use in his business to the extent of two hundred and fifty tons a week. If he used no ice in his business, he was under no obligation to pay for a pound. In any week, the quantity could vary from zero to two hundred and fifty tons, and its weekly fluctuation, throughout the life of the contract, could irregularly range between these limits. The weekly payment might be nothing or as much as $812.50; and for every week a credit was extended to the eighth day from the beginning of every week's delivery. From the time of the beginning of every weekly delivery of the ice to the date of the payment therefor, the title to the ice was in the purchaser, and the seller had no security for its payment except in the integrity

and solvency of Frederick. The performances, therefore, were not concurrent, but the performance of the non-assigning party to the contract was to precede the payments by the assignor.

When it is also considered that the ice was to be supplied and paid for, according to its weight, on the loading platform of Frederick, at an unvarying price, without any reference either to the quantity used, or to the fluctuations in the cost of production, or to market changes in the selling price, throughout three years, the conclusion is inevitable that the inducement for the appellee to enter into the original contract and into the renewal lay outside the bare terms of the contract, but was implicit in them, and was the appellee's reliance upon its knowledge of an average quantity of ice consumed, and probably to be needed, in the usual course of Frederick's business, at all times throughout the year, and its confidence in the stability of his enterprise, in his competency in commercial affairs, in his probity, personal judgment, and in his continuing financial responsibility. The contract itself emphasized the personal equation by specifying that the ice was to be bought for "use in his business as an ice cream maufacturer" and was to be paid for according to its weight "on the loading platform of the said W. C. Frederick."

When Frederick went out of business as an ice cream manufacturer, and turned over his plant and everything constituting his business to the appellant, it was no longer his business, or his loading platform, or subject to his care, control or maintenance, but it was the business of a stranger, whose skill, competency and requirements of ice were altogether different from those of Frederick. The assignor had his single plant in Baltimore. The assignee, in its purchase, simply added another unit to its ice cream business, which it had been, and is now, carrying on "upon a large and extensive scale in the City of Philadelphia and State of Pennsylvania, as well as in the City of Baltimore and State of Maryland." The appellee knew that Frederick could not carry

on his business without ice wherewith to manufacture ice cream at his plant for his trade. It also was familiar with the quantities of ice he would require, from time to time, in his business at his plant in Baltimore; and it consequently could make its other commitments for ice with this knowledge as a basis.

The appellant, on the other hand, might wholly supply its increased trade, acquired in the purchase of Frederick's business, with its ice cream produced upon a large and extensive scale by its manufactory in Philadelphia, which would result in no ice being bought by the assignee of the appellee, and so the appellee would be deprived of the benefit of its contract by the introduction of a different personal relation or element, which was never contemplated by the original contracting parties. Again, should the price of ice be relatively high in Philadelphia in comparison with the stipulated price, the assignee could run its business in Baltimore and furnish its patrons, or a portion of them, in Philadelphia, with its product from the weekly maximum consumption of two hundred and fifty tons of ice throughout the year. There can be no denial that the uniform delivery of the maximum quantity of two hundred and fifty tons a week would be a consequence not within the normal scope of the contract, and would impose a greater liability on the appellee than was anticipated. 7 *Halsbury's Laws of England, sec.* 1015, p. 501.

Moreover, the contract here to supply ice was undefined except as indicated from time to time by the personal requirements of Frederick in his specified business. The quantities of ice to be supplied to Frederick to answer his weekly requirements must be very different from, and would not be the measure of, the quantities needed by his assignee, and, manifestly, to impose on the seller the obligation to obey the demands of the substituted assignee is to set up a new measure of ice to be supplied and so a new term in the agreement that the appellee never bound itself to perform. Up to two hundred and fifty tons of ice a week, Frederick

engaged not to buy or accept any ice from any other party than the appellee. After Frederick had sold away his business, this covenant could not bind the assignee of his business, and even if it continued to bind Frederick, his refraining from not buying ice elsewhere was not a contemplated consideration for selling ice to any one except Frederick himself. *Kemp v. Baerselman* (1906), 2 K. B. 604, 608, 609. It was argued that Frederick was entitled to the weekly maximum of two hundred and fifty tons, and that he might have expanded his business so as to require this weekly limit of ice, and that, therefore, the burdens of the contract might have been as onerous to the appellee, if Frederick had continued in business, as they could become under the purporting assignment by reason of the increased requirements of the larger business of the assignee. The unsoundness of this argument is that the law accords to every man freedom of choice in the party with whom he deals, and the terms of his dealing. He cannot be forced to do a thing which he did not agree to do because it is like and no more burdensome than something which he did contract to do.

Under all the circumstances of the case, it is clear that the rights and duties of the contract under consideration were of so personal a character that the rights of Frederick cannot be assigned nor his duties be delegated without defeating the intention of the parties to the original contract. When Frederick went out of the business of making ice cream he made it impossible for him to complete his performance of the contract, and his personal action and qualifications, upon which the appellee relied, were eliminated from a contract which presupposed their continuance. Frederick not only attempted an assignment, but his course is a repudiation of the obligations of the contract. He is not even alleged to be ready to pay for any ice which might be delivered after the date of the purporting assignment, but the allegations of the declaration simply aver that the assignee alone had undertaken to perform the further contractual obligations of the assignor. Frederick, however, cannot be heard to say that

he has not repudiated a contract, whose contemplated performance his own act has made it impossible for him to fulfill. *Eastern Advertising Co. v. McGaw,* 89 Md. 86, 88.

While a party to a contract may as a general rule assign all his beneficial rights, except where a personal relation is involved, his liability under the contract is not assignable *inter vivos,* because any one who is bound to any performance whatever or who owes money cannot, by any act of his own, or by any act in agreement with any other person than his creditor or the one to whom his performance is due, cast off his own liability and substitute another's liability. If this were not true, obligors could free themselves of their obligations by the simple expedient of assigning them. A further ground for the rule is that not only is a party entitled to know to whom he must look for the satisfaction of his rights under the contract but, in the familiar words of Lord Denman in *Humble v. Hunter,* 12 Q. B. 317, "you have a right to the benefit you contemplate from the character, credit and substance of the person with whom you contract." For these reasons it has been uniformly held that a man cannot assign his liabilities under a contract, but one who is bound so as to bear an unescapable liability may delegate the performance of his obligation to another, if the liability be of such a nature that its performance by another will be substantially the same thing as performance by the promisor himself. In such circumstances the performance of the third party is the act of the promisor, who remains liable under the contract and answerable in damages if the performance be not in strict fulfillment of the contract. *British Waggon Co. v. Lea,* 5 Q. B. D. 149; *Robson & Sharpe v. Drummond,* 2 B. & Ad. 303; *Anson on Contracts,* 218, 219 (4th Am. Ed.), pp. 377-380; 7 *Halsbury's Laws of England,* p. 495; *Eastern Advertising Co. v. McGaw,* 89 Md. 86-88; *Tarr v. Veazey,* 125 Md. 199; 1 *Williston on Contracts,* secs. 411, 412, 418, 421, 420, note 48, at pp. 784, 785; *Arkansas Valley Smelting Co. v. Belden Mining Co.,* 127 U. S. 379; *Edison v. Babka,* 111 Mich. 235; *Schultz v. Johnson,* 5 B.

Mon. 497; *Lansden v. McCarthy,* 45 Mo. 106; *Hardy etc. Co. v. South Bend Co.,* 129 Mo. 222; *Paige v. Faure,* 229. N. Y. 114.

However, the analysis of the facts on this appeal leaves no room for doubt that the case at bar falls into the category of those assignments where an attempt is made both to transfer the rights and to delegate the duties of the assignor under an executory bilateral contract, whose terms and the circumstances make plain that the personal qualification and action of the assignor, with respect to both his benefits and burdens under the contract, were essential inducements in the formation of the contract; and further that the assignment was a repudiation of any future liability of the assignor. The attempted assignment before us altered the conditions and obligations of the undertaking. The appellee would here be obliged not only to perform the subsequent stipulations of the contract for the benefit of a stranger and in conformity with his will, but also to accept the performance of the stranger in place of that of the assignor with whom it contracted, and upon whose personal integrity, capacity and management in the course of a particular business he must be assumed to have relied by reason of the very nature of the provisions of the contract and of the circumstances of the contracting parties. The nature and stipulations of the contract prevent it being implied that the non-assigning party had assented to such an assignment of rights and delegation of liabilities. The authorities are clear, on the facts at bar, that the appellant could not enforce the contract against the appellee.

The principle applicable here has been enforced by this Court in *Eastern Advertising Company v. McGaw,* 89 Md. 72, and in *Tarr v. Veazey,* 125 Md. 199. In the latter of these two cases the Court said: "The rule was thus stated in *Delaware County v. Diebold Safe Co.,* 133 U. S. 488, and in *Burck v. Taylor,* 152 U. S. 651: 'A contract to pay money may doubtless be assigned by the person to whom the money is payable, if there is nothing in the terms of the contract

which manifests the intention of the parties to it that it shall not be assignable. But when rights arising out of contract are coupled with obligations to be performed by the contractor, and involve such a relation of personal confidence that it must have been intended that the rights should be exercised, and the obligations performed by him alone, the contract, including both his rights and his obligations, cannot be assigned without the consent of the other party to the original contract.'" *Kemp v. Baerselman* (1906), 2 K. B. 604; *Demarest v. Dunton Lumber Co.,* 161 Fed. 264; *Paige v. Faure,* 229 N. Y. 114, 127 N. E. 898, 899; *Burck v. Taylor,* 152 U. S. 651.

The authorities cited on appellant's brief have been examined, and they are not in conflict with the principles of law controlling this case, but rather serve to illustrate their application to other and different combinations of facts, which do not afford any ground for this Court to change its conclusion on the non-assignable character of the burdens and benefits arising from the stipulations and the nature of the contract in this appeal. The appellant stressed the case of *Tolhurst v. Associated Portland Cement Manufacturers* (1903), A. C. 414, as supporting its contention that the attempted assignment of the instant case involved no element of personal qualification or action. It may be said of this case, that it raised a great difference of opinion. It was decided one way by the King's Bench; and another way by the Court of Appeal, and there was a marked divergence of views in the House of Lords, which affirmed the Court of Appeal, with the Earl of Halsbury doubting, and Lord Robertson vigorously dissenting. (1901) 2 K. B. 811; (1902) 2 K. B. 660; (1903) A. C. 414.

The decision has never been accepted as wholly satisfactory and was not regarded as controlling in *Kemp v. Baerselman* (1906), 2 K. B. 604, where it was distinguished, and Lord Alverstone stated that the House of Lords had decided "in that particular case the contract for the supply of chalk for fifty years was to be treated as a contract for

the supply to a given cement-making place, and not a personal contract." p. 608.

Tolhurst was the owner of chalk quarries and made a contract with the Imperial Portland Cement Company, Limited, by which it was agreed that he would for fifty years supply to the company, and that the company should take and buy from him, at least seven hundred and fifty tons of chalk per week at a certain price, and so much more as the company should require for the whole of their manufacture of Portland cement upon their land near the quarries. The Imperial Company was formed for the purpose of establishing cement works on land obtained from Tolhurst, near the chalk quarries, which were to supply the chalk to be used in making the cement. Tolhurst had built a tramway to the boundary of the land of the Imperial Company, which was to continue the tramway on its own land to a convenient place in order to enable him to deliver chalk at the company's plant.

The Imperial Company sold out to a new and larger company, and went into voluntary liquidation, and its affairs had been fully wound up and all its assets had been distributed, when the assignee of its business and this contract brought an action against Tolhurst, claiming a declaration that the contract was binding upon Tolhurst, and that he must supply the chalk to the assignee in accordance with the contract.

It will be observed that the cement works and the chalk quarries were on parts of a tract of land that was originally owned by Tolhurst, and that the cement company was formed for the commercial exploitation of the chalk deposit. The location of the enterprise was obviously induced by the advantages of a continuous supply from the quarries, and so the contract was drawn that, on completion of the extension of the tramway on its land by the Imperial Company, "the said Alfred Tolhurst will, for a term of fifty years, to be computed from the 25th day of December, 1897, or for such shorter period (not being less than thirty-five years) as he shall be possessed of chalk available and suitable for the

manufacture of Portland cement, and capable of being quarried and got in the usual manner above water level, supply to the company, and the company will take and buy of the said Alfred Tolhurst at least seven hundred and fifty tons per week, and so much more, if any, as the company shall require for the whole of their manufacture of Portland cement upon their said land." The contract was, in substance, a sale of all the chalk in the quarries by weekly deliveries, less what might be sold by Tolhurst to others. As was said by Williston in his able work on contracts: "The case must be rested on a construction of the contract making the test of the amount of chalk to be furnished not the personal needs of the original promisee, but the capacity of that promisee's land, and the machinery thereon." *Williston on Contracts,* sec. 421, p. 786; *Kemp v. Baerselman* (1906), 2 K. B. 604, 608.

It is manifest that this case is to be distinguished from the one at bar, but, if not, this Court would not be prepared to follow the reasoning of the final decision, because the Imperial Company had renounced its obligations under the contract; had gone out of business, and had disposed of all its assets so as to be no longer able to pay the agreed price, and thereby the seller had lost the credit of the original contracting party, and the decision compelled Tolhurst to give credit to the assignee only. We take it to be sound doctrine that where one contracting party repudiates his obligations, the other party has the right of declining to be bound to a stranger by its terms. See *Anson on Contracts* (4th Am. Ed. by Corbin), note 2, pp. 378, 379; 1 *Williston on Contracts,* sec. 420; *Hand v. Evans Marble Co.,* 88 Md. 226, 229, 230.

As it is the opinion of the Court that the judgment below was in accordance with the principles of law applicable to the facts admitted by the demurrer, the judgment will be affirmed without comment on the ability of an assignee of an executory contract for the sale of goods to bring an action in

his own name. See Code, art. 8, sec. 1; *Banks v. McClellan,* 24 Md. 62, 80; *Hand v. Evans Marble Co.,* 88 Md. 226, 229, 230.

*Judgment affirmed, with costs to the appellee.*